[S.F. No. 25017. Mar. 21, 1988.]

TOWARD UTILITY RATE NORMALIZATION, Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
PACIFIC GAS AND ELECTRIC COMPANY, Real Party in
Interest.

COUNSEL

Preston Moore, Jonathan V. Holtzman, Thomas C. Vinje, Lee Kyriacou, Thomas J. Long and Morrison & Foerster for Petitioner.

Patrick J. Power as Amicus Curiae on behalf of Petitioner.

Janice E. Kerr, Hector Anninos, Suzanne Engelberg and Timothy E. Treacy for Respondent.

Howard V. Golub, Robert Ohlbach and Peter W. Hanschen for Real Party in Interest.

## OPINION

**KAUFMAN, J.**—This proceeding raises a narrow but important issue concerning the rates the Public Utilities Commission (commission) may allow an electric utility company to charge its customers between the time the utility commences operation of a major new power plant and the commission's final determination of what part of the utility's investment in the plant should be recognized as reasonable and prudent for ratemaking purposes. The commission's recent practice has been to authorize a major-additions adjustment clause (MAAC) account in which investment-related costs, e.g., depreciation and the allowed return to investors, based on the utility's entire recorded investment in the new plant, are entered as debits. The utility also may be allowed an interim rate increase, the proceeds of which are entered in the MAAC account as credits. After the commission finally determines what part of the investment should be recognized as reasonable and prudent, the debit entries are adjusted so as to reflect only the portion of the recorded investment that has been upheld. The MAAC account is then balanced: any excess of accrued revenue from the interim rates over the allowed investment-related costs is refunded to the ratepayers with interest, and, conversely, any undercollection of such costs is amortized through rate increases.

The present petitioner, Toward Utility Rate Normalization (TURN), a consumer-oriented nonprofit organization, challenges interim rates which the commission has allowed Pacific Gas and Electric Company (PG&E) to collect and credit to its Diablo Canyon Adjustment Account, a MAAC account, for the initial operation of Unit 1 of PG&E's Diablo Canyon Nuclear Power Plant. Petitioner contends the commission was powerless to allow the interim rates unless failure to do so would result in a financial emergency or unless the reasonableness of the investment costs covered by the rates is undisputed. We shall conclude that the commission's power is not so narrow, and that the commission has regularly pursued its authority in authorizing the interim rates.

Construction of the Diablo Canyon plant commenced two decades ago and has been beset by serious difficulties. The commission issued certificates of public convenience and necessity for Units 1 and 2 in 1967 and 1969 respectively, subject to approval by the federal Atomic Energy Commission, now the Nuclear Regulatory Commission (NRC). By 1976, PG&E's investment in Unit 1 amounted to $489 million. The NRC then required design changes to account for the recently discovered Hosgri seismic fault. After substantial remedial work had been performed, there arose the "mirror image" problem, apparently stemming from the erroneous application to Unit 2 of blueprints drafted for Unit 1 and vice versa. (See Stats. 1985, ch. 1212, § 2 [requiring commission to make specific findings on costs resulting from delays attributable to Hosgri-fault and mirror-image problems].) In 1984, the NRC finally granted a license for full-power operation, and PG&E applied to the commission for a rate increase to cover the costs of owning, operating, maintaining, and eventually decommissioning Unit 1. By that time PG&E's investment in Unit 1, including interest, exceeded $3 billion.

Commercial operation of Unit 1 began on May 7, 1985. Before that, on March 6, the commission issued an order which authorized no changes in rates but prescribed accounting procedures to take effect on commencement of the plant's commercial operation.

PG&E maintains an energy cost adjustment clause (ECAC) account, the purpose of which is "to permit prompt rate adjustment to offset unusual changes in fuel costs." (*Southern Cal. Edison Co.* v. *Public Utilities Com.* ((1978) 20 Cal.3d 813, 819 [144 Cal.Rptr. 905, 576 P.2d 945].) Absent accounting changes, the effect of operating Unit 1 would be to credit the ECAC account with substantial fuel cost savings, derived from the drastic difference between the costs of nuclear and fossil fuels, and thus automatically to lower rates. The March 6 order set up a Diablo Canyon Interim Account (DCIA) to be credited with the fuel cost savings resulting from Unit 1's operation and ordered that those savings be charged against the ECAC account so as to nullify any effect on rates.

The March 6 order also established the Diablo Canyon Adjustment Account (DCAA), which was to be debited with the investment-related costs of Unit 1, such as depreciation and a return to investors. The stated purpose of establishing this account was "to eliminate the possibility of retroactive ratemaking if the Commission grants all or part of PG&E's request" for a rate increase pertaining to Unit 1.[1]

---

[1] In an amicus curiae brief filed in the present review proceeding, the California League of Food Processors contends that the commission's present order violates the rule against retroactive ratemaking in that the commission's ultimate determination of the reasonableness of

On December 18, 1985, the commission rendered an opinion allowing PG&E an interim rate increase. On April 16, 1986, the commission issued an order substantially modifying the decision of December 18 and denying rehearing. The December 18 decision as thus modified constitutes the matter now before us.

The decision grants PG&E interim annual rate increases of (1) $53.8 million for the expenses of operating and maintaining Unit 1 and (2) $334.2 million for investment-related costs. The latter increase is measured by the estimated annual fuel savings from the operation of Unit 1 and is offset by an equivalent reduction in ECAC revenue. Thus, PG&E is allowed to collect the $53.8 million outright and to retain $334.2 million in estimated energy cost savings that would otherwise be passed on to the ratepayers. The interim account (DCIA) is merged into the regular MAAC account (DCAA), to which the entire $388 million increase is to be credited and thereby become subject to refund if the total credits from interim rate increases turn out to exceed the revenue ultimately allowed on account of Unit 1.

 TURN does not contest the $53.8 million increase for operation and maintenance expenses but contends that the commission has no power to grant *any* increase for investment-related costs, prior to a final determination that the costs were reasonable and prudent, unless (1) the increase is necessary to forestall a financial emergency or (2) the prudency of the portion of the investment underlying the costs is beyond dispute. TURN

---

PG&E's investment in Unit 1 would affect rates that had been charged from the commencement of commercial operation. This contention is not properly before us because it was not set forth in TURN's application for rehearing before the commission in the present case. (Pub. Util. Code, § 1732.)

In any event, the parties here, including TURN, appear correct in their assumption that the MAAC account arrangement provided by the present decision does not violate the rule against retroactive ratemaking. In *Southern Cal. Edison Co. v. Public Utilities Com., supra,* 20 Cal.3d 813, 816, this court said: "If the prohibition against retroactive ratemaking is to remain a useful principle of regulatory law and not become a device to fetter the commission in the exercise of its lawful discretion, the rule must be properly understood. In *Pacific Tel. & Tel. Co.* v. *Public Util. Com.* (1965) 62 Cal.2d 634 . . . , the first decision of this court on the question, we construed Public Utilities Code section 728 to vest the commission with power to fix rates prospectively only. But we did not require that each and every act of the commission operate solely in futuro; our decision was limited to the act of promulgating 'general rates.'" (Fn. omitted.) *Southern Cal. Edison* went on to hold that a commission order (1) changing a fuel cost adjustment clause so as to measure fuel expense by actual monthly costs rather than by a 12-month forecast of expense under average weather conditions and (2) requiring the utility to refund the difference between amounts collected under the original clause and what would have been collectible during the same period under the clause as revised did not constitute the sort of rate regulation governed by the rule against retroactive effect.

relies principally on the following three provisions of the Public Utilities Code. (All section references herein are to that code unless otherwise indicated.) Section 451 provides: "All charges demanded or received by any public utility . . . for any product or commodity furnished or to be furnished or any service rendered or to be rendered shall be just and reasonable. . . ." Section 454, subdivision (a), provides that "no public utility shall raise any rate or so alter any classification, contract, practice, or rule as to result in any increase in any rate, except upon a showing before the commission and a finding by the commission that the increase is justified." Section 463, subdivision (a) (added in 1985), provides: "For purposes of establishing rates for any electrical or gas corporation, the commission shall disallow expenses reflecting the direct or indirect costs resulting from any unreasonable error or omission relating to the planning, construction, or operation of any portion of the corporation's plant which cost, or is estimated to have cost, more than fifty million dollars ($50,000,000), including any expenses resulting from delays caused by any unreasonable error or omission. Nothing in this section prohibits a finding by the commission of other unreasonable or imprudent expenses. . . ."

TURN argues that with only two exceptions, not applicable here, the foregoing statutory provisions prohibit any interim rate increases to compensate for the utility's investment-related costs. ■ One exception applies when the increase is necessitated by financial emergency; the other, when the increases are for investment costs that are undisputedly reasonable. The two exceptions are established by commission decisions (e.g., *San Diego Gas & Electric Co.* (1979) 1 Cal.P.U.C.2d 146, 152; *Citizens Utilities Co.* (1971) 72 Cal.P.U.C. 181, 184; *So. Cal. Edison Co.* (1971) 72 Cal.P.U.C. 77) and seem consistent with the statutory requirements, in that (1) an inference of reasonableness is justified by a finding that because of financial emergency an interim increase is essential to the continuation of the utility's service and thus to preservation of the commission's jurisdiction, and (2) a lack of dispute over the reasonableness of investment-related costs makes the "showing before the commission" (§ 454, subd. (a)) unnecessary.

■ From the existence of those two exceptions, however, it does not follow that no other circumstances can justify an interim increase. In its present decision the commission expressly recognizes that until recently its practice was as stated by TURN; it granted interim rate increases only upon a finding that the interim increase was required by a financial emergency, or that the reasonableness of the pertinent costs was undisputed. But the commission expressly declines to make any such finding in this case. Instead it invokes the precedent of its decisions in 1983 and 1984 which provided for MAAC accounts and interim rates during initial operation of the San

Onofre Nuclear Generating Station (*Southern California Edison Co.* (1983) 55 Pub.Util.Rep.4th 537 [Dec. No. 83-09-007]; *id.* (1984) 64 Pub.Util.Rep.4th 452 [Dec. No. 84-12-060]) and of the Helms Pumped Storage Project, whereby water is pumped uphill during off-peak hours so as to increase generating capacity during peak hours (*Pacific Gas and Electric Co.* (July 5, 1984) Dec. No. 84-07-070). Those decisions allowed interim rate increases, to be held in a MAAC account and thus subject to refund, upon commencement of commercial operation of a major new generating plant, where at least the following factors were present: the new plant represented a substantial part of the utility's total capital investment, the new plant's operation would result in fuel or energy savings, and a considerable period of time was expected to elapse before final determination of the prudency of the utility's investment in the new plant.

Those factors are clearly present here. PG&E's actual investment in Unit 1 exceeds $3 billion, and the plant can be operated for a fraction of the energy costs incurred by fossil fuel plants. Moreover, when issuing its present decision, the commission properly anticipated a substantial delay in its final prudency determination. Though based on 57 days of hearings and extensive briefing, the decision disposed only of "Phase 1A" of PG&E's application, i.e., "the expenses and investment to be recognized for setting interim rates." Still ahead were hearings on Phase 1B, a "more detailed investigation of" such expenses and investment and "alternatives to traditional ratemaking"; Phase 2, the amount of investment the commission should recognize as reasonable; and Phase 3, "the financial and ratemaking effects of the investment adopted in Phase 2."

Another reason given by the commission for the present interim increase is "the importance of cash flow to [PG&E] while we are in the process of making a final determination in this matter." There was evidence that cash flow is currently important in keeping down PG&E's costs of raising capital. The effect of the contested interim rate increase is to provide PG&E with the cash flow that arises out of its estimated fuel savings from operation of Unit 1 and thus is not dependent on increased payments by the current ratepayers. The commission makes clear that its determination is not based on any prejudgment of the reasonableness of any of PG&E's costs related to its investment in Unit 1. Instead, the commission expressly refuses to consider the reasonableness or unreasonableness of such costs as a basis for its present decisions.

TURN's petition declares that the issue it raises "may be reduced to a single question: Until a final [prudency] determination is made, to whom does the law assign the risk that current electric rates will either exceed or

fall short of the still undetermined amount of reasonable capital expenditures?" TURN contends that "PG&E and the Commission have decided that the ratepayers must bear that risk," but that sections 451, 454, and 463 require that "[u]ntil the capital expenditures are found to be reasonable and prudent after proper hearings and findings, they are fully the responsibility of the utility and may not be imposed on the ratepayers."

The possibility that the current rates will "fall short of" the capital expenditures ultimately found reasonable can place no undue burden on the current ratepayers, but to the contrary may provide them with a windfall, shifting the burden to those future ratepayers who, under the MAAC arrangement, will have to make up for the undercollection. Conversely, if current ratepayers are burdened because current charges for investment-related costs exceed those later found reasonable, the excess will be refunded, with interest, to future ratepayers. As commission counsel point out in their answer to TURN's petition, the provision for interim rates in a MAAC account lessens both of these risks in accordance with the "key" principle "that costs borne by ratepayers should closely match benefits they receive."

That principle was codified by the 1985 Legislature in section 454.8, which provides: "In any decision establishing rates for an electrical or gas corporation reflecting the reasonable and prudent costs of the new construction of any addition to or extension of the corporation's plant, when the commission has found and determined that the addition or extension is used and useful, the commission shall consider a method for the recovery of these costs which would be constant in real economic terms over the useful life of the facilities, so that ratepayers in a given year will not pay for the benefits received in other years."

The operation of this section is not limited to cases in which the commission has already determined the prudency of the construction costs; instead, the section applies as soon as the commission determines that the new plant "is used and useful." Diablo Canyon Unit 1 must be deemed used and useful since it is in commercial operation, generating power with substantial fuel savings, under a certificate of public convenience and necessity. The dissent argues that a prior prudency determination is prerequisite to application of the section because the section specifies decisions on rates "reflecting the reasonable and prudent costs of . . . new construction." But the category of rates "reflecting" reasonable construction costs is not confined to rates based on such costs. The interim rates now before us reflect the construction costs because (1) those rates would not be allowed but for a possibility or expectation that some or all of the construction costs

will ultimately be found reasonable and prudent, and (2) the interim rates are credited to the MAAC account and so are subject to any refunds called for by a final determination of the prudency of the construction costs.

Thus, section 454.8 directs the commission to consider, in setting interim rates, a balancing of interests not only between PG&E and the ratepayers as a whole but also between current ratepayers and future ratepayers. Interim rates that allow recovery of investment-related costs in a lesser amount than those eventually found reasonable will benefit current ratepayers at the expense of future ratepayers (who will have to pay the accumulated deficiency) and of PG&E (which is deprived of cash flow), whereas the possibility that TURN claims must be avoided under all circumstances—interim rate collection from current ratepayers of more than the reasonable amount of investment-related costs—not only gives PG&E additional cash flow but also will entitle future ratepayers to receive refunds with interest. (See § 453.5 [rate refunds must be paid to all current utility customers, and, when practicable, to prior customers on an equitable pro rata basis, except that the commission may authorize refunds to residential and other small customers based on current usage].)

The commission's power to grant interim rate increases was recognized by this court in *City of Los Angeles* v. *Public Utilities Commission* (1972) 7 Cal.3d 331 [102 Cal.Rptr. 313, 497 P.2d 785]. There we annulled a commission order granting a general rate increase to Pacific Telephone but provided that the commission "may grant interim rate increases should it find them appropriate while it reconsiders Pacific's application for rate increases," citing *Pacific Telephone and Telegraph Company* (1949) 48 Cal.P.U.C. 487. (7 Cal.3d at pp. 354, 359.) In the cited decision, the commission stated that some of the parties "questioned the jurisdiction and authority of this Commission to grant an interim rate increase. The argument in support of this position is that there is nothing specific in the Public Utilities Act that authorizes the grant by the Commission of that type of rate relief. It is an elementary rule of law that the power to grant a particular relief carries with it all the incidental, necessary and reasonable authority to grant that which is less. It is apparent that the authority delegated to this Commission by the Public Utilities Act to award rate relief to a public utility carries with it the incidental and implied power to grant interim rate relief, if the facts warrant such summary relief. Of course there must be a prima facie showing of an emergency condition before the Commission would be justified in granting rate relief on an interim basis." (48 Cal.P.U.C. at p. 488.) The commission then granted an interim increase to compensate for (1) a decline in earnings below the return authorized by a previous decision and (2) an increase in wage costs. (*Id.* at p. 491.)

In the present case, the commission was not faced with an "emergency" in the sense of a threat to the utility's survival, but the situation was one in which fairness to both the utility and the public required immediate action. The overriding circumstance was the prospect of many months and years of hearings and deliberations before the reasonableness and prudency of the many items of cost related to PG&E's huge investment in Diablo Canyon Unit 1 could be finally determined. TURN apparently concedes that under these conditions it was proper to set up the debit side of the MAAC account in which PG&E could record its ongoing investment-related costs so that eventually they could be adjusted in accordance with the later determination of their reasonableness. In TURN's view, however, the lack of any immediate finding of the reasonableness of any of those costs required an assumption that all of them were unreasonable. It would follow that PG&E would be required to *reduce* its rates by the full amount of its substantial fuel savings from the operation of its new nuclear generating plant, and ultimately, *after* the final prudency determination, to collect *all* of its allowed investment-related costs from the then ratepayers.

Theoretically, TURN's solution would give rise to no injustice if the commission were ultimately to make proper findings that PG&E's entire investment in Unit 1 was improper and so should be disallowed. But to the extent that any investment-related costs turn out to be proper, the TURN view would (1) require future ratepayers to pay the accumulated costs that should have been borne by current ratepayers and (2) deprive PG&E of a needed cash flow that it would have enjoyed but for the inevitable delay in the prudency determination.

Though the commission's decision declares that all of PG&E's investment-related costs in Unit 1 are in dispute, it does not follow that the commission was required to assume that PG&E's entire investment in a power plant that is in commercial operation, producing over $300 million in annual fuel savings, would be disallowed. TURN complains that energy savings have nothing to do with what amount of investment-related costs is reasonable or with the amount of PG&E's need for cash flow. But the commission could properly determine that allowing PG&E temporarily to retain the fuel savings, rather than pass them through, imposes less burden on current ratepayers than would an outright increase, and that this lesser degree of burden is a properly considered factor in balancing the respective interests of those ratepayers against those of future ratepayers and of PG&E. TURN also complains that the interim rates are based on estimated fuel savings which turned out to be excessive in light of subsequent fluctuations in fossil fuel prices. The commission had discretion to use as its guideline a fixed standard of estimated fuel savings rather than a fluctuating

standard of actual savings, thus not only avoiding an outright rate increase but also imparting to PG&E's cash flow a certainty that would help keep down the costs of raising capital.

This court's review of commission decisions is generally limited to a determination whether the commission has regularly pursued its authority. (Cal. Const., art. XII, § 5; § 1757.) We conclude that the commission had authority to determine that the interim rate increases, subject to refund, prescribed by its decisions of December 18, 1985, and April 16, 1986, are "just and reasonable" (§ 451) and "justified" (§ 454, subd. (a)). We further conclude that the statutory requirement of disallowing construction costs arising from unreasonable error or omission (§ 463, subd. (a)) does not apply to the present decisions because they leave the reasonableness of construction costs to future determination.

Accordingly, the decisions are affirmed.

Lucas, C. J., Broussard, J., Arguelles, J., Eagleson, J., and Brauer, (Harry F.), J.,* concurred.

**MOSK, J.**—I dissent from the conclusion of the majority that the interim rate increase is just and reasonable.

First, I disagree with the majority's reliance on decisions of the Public Utilities Commission as justification for the increase. The majority recognize that until recently the commission itself has acknowledged interim rate increases are justified to compensate for a utility's investment-related costs only if there is a financial emergency or for costs that are undisputably reasonable. As the opinion holds, these are exceptions to the general principle that rate increases may not be granted until a final determination of costs, and the exceptions are valid because they comply with the statutory requirement of reasonableness. The majority then rely on two recent instances in which the commission allowed interim increases despite the absence of these factors, and which established an additional exception based on other matters as justifying such an increase. The opinion concludes that these factors are present in the instant case. (*Ante,* pp. 875-876.) But the commission's judgment as to the requirements that must be met in order to comply with the statutory standards is not determinative. That is the issue in the present proceeding. Since the majority do not hold that the additional exception created by the commission in its recent decisions conforms to the

---

*Associate Justice, Court of Appeal, Sixth Appellate District, assigned by the Chairperson of the Judicial District.

statutory requirements, its reliance on these decisions does not support the holding.

Second, I disagree on several grounds with the majority's determination that section 454.8 of the Public Utilities Code[1] authorizes the increase. In my view, the section by its own terms does not apply to interim rate increases but only to increases based on a final determination of reasonable rates. It provides: "In any decision establishing rates for an electrical or gas corporation *reflecting the reasonable and prudent costs of the new construction of any addition to or extension of the corporation's plant,* when the commission has found and determined that the addition or extension is used and useful, the commission shall consider a method for the recovery of these costs which would be constant in real economic terms over the useful life of the facilities, so that ratepayers in a given year will not pay for the benefits received in other years." (Italics added.)

As I see it, the language emphasized above requires the rates set to reflect the reasonable costs of new construction and, as the majority recognize, the commission has expressly stated in its decision that its determination as to interim rates is not based on any judgment of the reasonableness of any of Pacific Gas and Electric Company's (PG&E) investment costs. (*Ante,* p. 876.) Thus, the interim rates cannot "reflect the prudent costs of the new construction of any addition to . . . the corporation's plant." All the construction costs are disputed. The fact that some of the disputed costs may ultimately be allowed and that customers may receive refunds, does not mean that the rates allowed by the commission reflect prudent construction costs.

Even if the statute did allow interim rates in this situation, the majority are unjustified in concluding that the rates which were set represent an appropriate balance between the benefits realized by present and future ratepayers. This determination is entirely premature, since it depends on the amount of the construction costs ultimately allowed. The commission itself recognized this, since it expressly declined to justify the granting of interim rates on such basis. Indeed, it went to great pains to make the point. In its opinion, the commission at first held that the interim rates were justified under the principle that "plant costs borne by ratepayers should closely match the benefits they receive." On rehearing, it held that the interim increase could not be justified under this principle because it is "inapplicable at this stage of the proceeding. The plant costs to be borne by ratepayers are not to be considered until Phase 2."

---

[1] All statutory references are to the Public Utilities Code.

Nor do I agree with the majority's reliance on PG&E's need for cash flow as justifying the increase. There is nothing in either the statutes governing the circumstances under which rate increases can be granted or in prior decisions of the commission or this court which would allow the granting of an interim rate increase on the ground that cash flow is "important" in keeping down the utility's costs of raising capital. Indeed, the previous standard followed by the commission, which required a financial emergency to justify the grant of an interim rate increase, would seem to negate a cash flow problem as a sufficient ground for such an increase. Admittedly, the desirability of cash flow does not rise to a financial emergency.

Moreover, this justification for the increase could have a broad impact on the commission's authority to grant interim increases since a utility, in common with other businesses, will often desire to increase its cash flow in order to keep down costs of raising capital. The extent of the utility's need for cash has not been estimated as a basis for the increase; the entire fuel savings is withheld from the ratepayers for a period which the opinion recognizes may run into several years, on the general justification that the withholding of these funds from the public will ease PG&E's ability to raise capital.

There is considerable merit in the argument of Toward Utility Rate Normalization (TURN) that the granting of the interim rate increase is unfair to ratepayers. In its brief, TURN states: "Countless times, PG&E's ratepayers have held the utility harmless against rising fuel costs. The few times that fuel costs decline are hardly proper occasions on which to change the rules of the game. There is very little 'balance' in the balancing account procedure if the utility passes increased fuel costs on to the ratepayers but keeps fuel savings for itself." Even if the retention by the utility of the amount of fuel savings, as here, is said to be only temporary, the majority's decision, in my view, unjustly deprives ratepayers of the amounts withheld.