[No. S012916. Nov. 15, 1990.]

CAMP MEEKER WATER SYSTEM, INC., Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
CAMP MEEKER RECREATION AND PARK DISTRICT, Real
Party in Interest.

**COUNSEL**

Geary, Shea, O'Donnell & Grattan and William E. Geary for Petitioner.

Jim Burling as Amicus Curiae on behalf of Petitioner.

Janice E. Kerr, Michael B. Day and Timothy E. Treacy for Respondent.

Joseph Baxter for Real Party in Interest.

**OPINION**

**EAGLESON, J.**—We are asked to determine whether, pursuant to article XII of the California Constitution or legislative enactment, the Public Utilities Commission (commission) has jurisdiction to adjudicate interests in real property, and, if so, the effect of such adjudication on the interests of persons who are not regulated utilities in that property. Petitioner Camp Meeker Water System, Inc. (CMWSI), a regulated utility, also challenges, as unsupported by the evidence, the finding and conclusion of the commission that CMWSI is the holder of an extensive easement for water resource development and exploitation in lands in which it does not claim an interest and to which it does not hold title.

On examination of the record it appears that, in the exercise of its rate-making authority, the commission has done no more than construe deeds conveying real property and easements to petitioner and its predecessor. It has done so in the same manner that a court or agency construes any written instrument (see Civ. Code, § 1066 et seq.; Code Civ. Proc., §§ 1857, 2077) for the purpose of ascertaining facts relevant to the merits of the application for increased rates, and not for the purpose of resolving disputes between parties claiming rights under the deeds, or to enforce rights conveyed by those deeds. The commission acknowledges that it does not have jurisdiction equivalent to that of a court, to adjudicate incidents of title, and that it would be bound by a judicial ruling in a quiet title action brought by any person claiming an interest in the subject property who believes the commission ruling clouds his title. (Code Civ. Proc., § 760.010 et seq.)

The only issues properly before us in this proceeding, therefore, are whether the evidence supports the commission's construction of the deeds in issue, and its decision, based on that construction, to deny in part petitioner's application for a rate increase. In undertaking that review this court is limited to determining if the commission has regularly pursued its authority. Factual findings of the commission are not reviewable unless a petitioner asserts that the *petitioner's* constitutional rights have been violated. (Pub. Util. Code, §§ 1757, 1760.)[1] Since CMWSI makes no such claim, and there is evidence to support the commission decision, we shall affirm.

I

This dispute arises in major part because wells located on a 16-acre parcel of land owned by CMWSI no longer supply water to the system which serves approximately 350 customers in or near the Sonoma County community of Camp Meeker. Wells on an adjacent parcel, the "Chenoweth parcel," which is a watershed for the CMWSI land, currently supply approximately half of the water needed by the utility. CMWSI is wholly owned by members of the Chenoweth family, who are also the record title owners of the Chenoweth parcel. The CMWSI and Chenoweth parcels were conveyed to the Chenoweths in 1951 by members of the Meeker family who then owned and operated the Camp Meeker Water System (CMWS). The Chenoweths incorporated the utility in 1959.

In November 1983, CMWSI sought a rate increase based on a claim that in order to meet the needs of its customers for water CMWSI would have to

---

[1] All further references to code sections herein are to the Public Utilities Code unless otherwise indicated.

lease additional wells on the Chenoweth parcel. After extended hearings, and a rehearing, in decision No. 89-10-033, the commission concluded that CMWSI owns an easement that permits it to obtain water from the entire 600-acre Chenoweth watershed, and therefore is not obligated to compensate the Chenoweths for its exercise of that easement, or to pass on the cost of future well site use to the ratepayers.

This proceeding arises on the petition of CMWSI for review of that decision. As we have noted, and will explain in greater detail below, the commission decision construed two 1951 deeds, the first of which conveyed CMWS, the sixteen-acre parcel of land on which the water system is located, and the easements in issue here to the Chenoweths. The second conveyed the lands making up the 600-acre parcel to the Chenoweths and again conveyed to them property owned by CMWS. The commission found that the first of these deeds conveyed an easement for water rights on the adjacent 600-acre Chenoweth parcel which the grantors had not yet transferred to the Chenoweths. Based on that construction it ordered:

1. CMWSI to enforce those water rights against the record titleholders;

2. CMWSI to record a notice of intent to preserve its easements pursuant to Civil Code section 887.060;[2]

3. The commission's Advisory and Compliance Division to intervene in proceedings before the State Water Resources Control Board to prevent the record titleholders of the Chenoweth parcel from obtaining rights inconsistent with those held by CMWSI under its easement;

4. The Advisory and Compliance Division to forward copies of the decision to title insurance companies and take other steps to ensure that any future purchaser of the burdened 600-acre property would have actual notice of the easement.

The commission, relying on cases decided under Code of Civil Procedure section 902, opposed issuance of the writ of review on the ground that CMWSI was not a party aggrieved by its decision. The right to petition this court for review of a decision of the commission is governed by section 1756, however. That section expressly authorizes a petition by an applicant for rehearing before the commission. Nonetheless, because CMWSI benefits from the commission ruling that it holds easements in the Chenoweth parcel, its standing to complain that the factual findings underlying the

---

[2] Civil Code section 887.060, subdivision (a): "The owner of an easement may at any time record a notice of intent to preserve the easement."

decision are erroneous extends only to the impact of that decision on its application for a rate increase. ■ ■■■■■ The jurisdictional claim, and the related assertion that by determining CMWSI's interests in the Chenoweth parcel the commission denied due process to members of the Chenoweth family who are record titleholders, will not be considered.[3]

Because the commission regularly pursued its authority in reaching its decision, the only issue to be addressed is CMWSI's claim that the commission's finding that CMWSI owns rights to substantially all, if not all, wells, stored surface water, and surface runoff of the Chenoweth parcel, is not supported by the evidence.

## II

### PROCEDURAL/EVIDENTIARY HISTORY

CMWSI filed its application for authority to increase revenues from $34,200 to $53,800 (a 57.3 percent increase) on November 13, 1983. A 12.74 percent offset increase was authorized by resolution on November 22, 1983, after which hearings were held addressed to the balance of the requested increase, an end to an existing moratorium on new connections, and a 6.5 percent attrition increase. On September 19, 1984, the commission granted an increase of 19.46 percent, continued the ban on new connections, granted attrition increases, and found:

"11. Members of the Meeker family, original owners of the water system at Camp Meeker, executed a deed conveying all but approximately 16 acres of the land on which the water system was located to members of the Chenoweth family on November 29, 1951, without Commission authorization.

---

[3] Those claims, which attempt to assert the rights of other parties, assume that the commission decision has res judicata effect and may be binding in future ratemaking or judicial proceedings.

Pursuant to section 1709, the commission decision—that CMWSI is not presently entitled to a rate increase—is binding as, "[i]n all collateral actions or proceedings, the orders and decisions of the commission which have become final shall be conclusive." The Public Utilities Code does not give the ruling any greater effect. This court has recognized that when the commission exercises its *judicial power*, its orders or decisions have "the conclusive effect of res judicata as to the issues involved where they are again brought into question in subsequent proceedings between the same parties." (*People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 630 [268 P.2d 723].) However, the commission exercises its *legislative power*, not its judicial power, when it fixes rates. (*Ibid.*; *Southern Pacific Co.* v. *Railroad Com.* (1924) 194 Cal. 734, 739 [231 P. 28].) Therefore, its determination of the property rights is subject to relitigation in any court of law which is asked to determine these interests.

"12. The question of fact as to whether the property described in the Meeker deed of November 29, 1951 contained only private nonutility property and no public utility water resources has not been presented to the Commission for its determination."

The commission then concluded:

"The deed from the Sonoma County Land Title Company to Hardin T. Chenoweth, William C. Chenoweth, and L. C. Chenoweth dated November 29, 1951 is void for want of authorization by the Commission."[4]

A rehearing was granted on February 6, 1985, limited to treatment of the Chenoweth parcel. Two years of unsuccessful negotiations between the owners of that parcel and the commission's Division of Ratepayers' Advocates (DRA), ensued. Resumption of evidentiary hearings before the administrative law judge (ALJ) were delayed until January 1988, by the death of William Chenoweth, president of CMWSI.

At the hearings a representative of DRA testified. DRA recommended that the commission declare the Chenoweth parcel, on which the several wells sought to be leased by CMWSI were located, to be public utility property used and useful in the public utility water service of CMWSI. That recommendation became the central issue in the hearings. The DRA representative testified that he believed CMWSI was entitled to water from the Chenoweth parcel, but conceded that he had not found recorded evidence to support his conclusion that the well sites on the Chenoweth parcel had been dedicated to public utility use. CMWSI offered documentary evidence dating back to 1932 to support its claim that the Meeker family had segregated the family and utility properties.

Among those documents was a summary of evidence made by the commission staff in 1932 in conjunction with a CMWS rate increase request. That summary included a cost estimate of the value of lands reserved for springs and water tank sites, apparently referring to sites on the Chenoweth

---

[4]Section 851 provides, inter alia: "No public utility . . . shall sell . . . the whole or any part of its . . . plant, system, or other property necessary or useful in the performance of its duties to the public . . . without first having secured from the commission an order authorizing it so to do . . . .

"Nothing in this section shall prevent the sale . . . or other disposition by any public utility of property which is not necessary or useful in the performance of its duties to the public, and any disposition of property by a public utility shall be conclusively presumed to be of property which is not useful or necessary in the performance of its duties to the public, as to any purchaser . . . dealing with such property in good faith for value; . . ."

parcel. Reference was also made to an expense item for taxes, part of which was determined to be chargeable to the applicants' private realty holdings.

Other documents from the 1932 rate proceedings included a land and right-of-way appraisal exhibit prepared by the commission staff which reflected an inventory of 21 parcels or lots owned by CMWS, the total acreage of which was 15.75 acres. No properties other than those parcels which contained springs, diversions, or tanks actually used or proposed for utility service were identified in that inventory.

A ledger sheet from the 1935 records of the Sonoma County Tax Collector identified 21 properties as associated with CMWS, but those parcels did not conform in all respects to the commission's 1932 inventory. An inventory of the estate of Effie M. Meeker, who died intestate in 1940, was filed in 1941. That inventory listed her interest in "Camp Meeker Water System lots" whose descriptions, with a single exception, corresponded to the lots listed as associated with CMWS in the 1935 records of the tax collector. A handwritten annotation in the margin recited: "Appraised as part of water system." Other lots in the estate's inventory did not appear on the tax collector's list and were not among CMWS properties. The appraisal of the estate's real property valued the properties of CMWS separately.

In 1951 the estate of Effie Meeker agreed to sell to Hardin T. Chenoweth, and his sons, William C. and L. C. Chenoweth, 14 of the 17 distributive interests in the estate.[5] The estate contracted to sell those interests in:

"[1] all of the property owned by said Meeker Estate located in the County of Sonoma . . . , [2] together with the Camp Meeker Water System, and all other property both real and personal appurtenant to said system and used therefor, [3] together with all moneys in bank in the name of said Camp Meeker Water System, and all outstanding receivables of the said Camp Meeker Water System."

The agreement provided that "[t]he property herein referred to and described as the Camp Meeker property generally consists of [1] approximately 800 acres of land more or less located as aforesaid, [2] the Camp Meeker Water System, and [3] the inventory of personal properties, together with the cash in bank in the name of said Camp Meeker Water System, and the accounts receivable."

The agreement also provided that the administratrices would cooperate in obtaining the approval of the commission for the transfer of CMWS, on

---

[5] The acting administratrices had at that time obtained agreement only from the holders of those interests.

which the agreement was conditioned, and, that: "It is fully understood and agreed by and between the parties hereto that the [administratrices] have not joined in or been a party to the dedication of any of said property herein referred to for the purpose of the operation of the Camp Meeker Water System other than the acreage consisting of 14 acres more or less immediately surrounding the various springs now used in the operation of the Camp Meeker Water System."

On October 10, 1951, the administratrices, the Chenoweths, and Paul R. Edwards, who held a one-third interest in the estate, sought, and on November 6, 1951, the commission granted, authority for the transfer of CMWS to the Chenoweths. The commission opinion acknowledged that the estate was transferring properties other than its interest in CMWS, and noted that of the $24,880.28 purchase price, $8,500 had been assigned to CMWS, and the balance to "certain nonoperative lands." The opinion also noted that the purchasers intended to acquire the remaining interests in the estate "to the end that they will have entire ownership of the water system properties."

Of particular importance in the proceedings were the November 26, 1951, and November 29, 1951, deeds by which the properties were conveyed to the Chenoweths.

The first deed, executed on November 26, 1951, conveyed [italics added]:

". . . all of the right, title, and interest of the said grantors in that certain property situated in the County of Sonoma, State of California, and generally known as the Camp Meeker Water System, including all pipes, whether covered or on the surface, used and employed in conveying water to customers of said System, and all connections and facilities of every kind and character used and useful in the operation of said System, *and also all rights, and privileges, and easements had, used, and enjoyed in the operation of said System and also all water and water rights appurtenant to said system and used and useful* in its operation and also all tanks, reservoirs, springs, spring traps, pipes, and ditches leading thereto or therefrom;

"All real property . . . used in connection with the Camp Meeker Water System, a public utility, including the following parcels of real property . . . [description of eight parcels totalling just over fifteen acres, ten lots, and one block].

"Together with any and all other real property . . . now or heretofore used as springs, reservoirs, or tank sites in connection with said Camp Meeker Water System, a public utility."

The concluding paragraphs of the deed provided that in conjunction with the sale of the utility the Meeker family sellers were conveying all water rights and easements appurtenant to the property used by the utility:

"Together with all water and water rights appurtenant to and belonging to the above described land, and all ditches, pipes, and improvements, and all rights, privileges, and easements belonging thereto or commonly had, used, or enjoyed therewith, together with all of the personal property used in the conduct and operation of said Camp Meeker Water System and owned in common by the said grantors herein.

"It is the intent and purpose of this Deed and instrument of transfer to convey not only the properties particularly described herein, but also *all rights, easements, and privileges and facilities appurtenant to said Camp Meeker Water System and commonly used, had, and enjoyed in the maintenance and operation thereof,* whether expressly described herein or not, and this deed shall be so construed as to accomplish such purpose." (Italics added.)

The second deed, executed on November 29, 1951, conveyed to the Chenoweths five specifically described "Highland Farms" parcels comprising 48.4 acres; four parcels subtitled "Timberland and acreage," among which was the north one-half of the southwest one-quarter of lot 27, "except portions heretofore conveyed, but including Camp Meeker Water System lots"; lots in five subdivisions of the Camp Meeker area subtitled "Subdivision lands"; and under the subtitle "Camp Meeker Water System," two categories of property:

1. "All parcels of land . . . standing in the name of Camp Meeker Water System, a Public utility,

2. "Church, Camp Meeker Store, Post Office, school building, library and water building sites."

This deed also conveyed all of the interest of the estate in the personal property of the CMWS.

The November 29, 1951, deed, executed, as was the earlier deed, by a title company, was recorded at the request of L. G. Hitchcock, the attorney who had represented the Chenoweths in negotiating the purchase of CMWS and in arranging separate conveyance to the Chenoweths of the estate's interest

in that 600-acre parcel.[6] In his declaration, Hitchcock, who had supplied the information used for preparation of the deeds, stated that the reference to CMWS property in the omnibus clause of the November 29, 1951, deed conveying that property was included as a precautionary measure to ensure that any CMWS property not specifically described in the earlier deed would be conveyed.

Hitchcock also stated that CMWS had been recognized as a public utility by the California Railroad Commission, the predecessor to the present commission, and was such at the time of its acquisition by the Chenoweths. The term "used and useful" in the November 26, 1951, deed was intended by both the grantees and grantors to include pipes, connections and facilities; the term "water and water rights" appurtenant to the system and useful in its operation was intended to include only the water, water rights, privileges, and easements on property owned by CMWS as described in that deed.

Hitchcock had inquired, prior to the purchase of the system by the Chenoweths, if any watershed other than those in the acreage expressly owned by CMWS had been dedicated for water supply purposes to the utility. At an ensuing meeting with commission staff member Coleman, Hitchcock was told by Coleman that he had no knowledge of any watersheds or lands encumbered, encroached upon, or dedicated to serve CMWS for the purpose of securing a water supply other than the acreage expressly owned by CMWS. Coleman represented that if there were such rights he would be aware of them. The November 26, 1951, deed was prepared for the grantors and grantees with this understanding and with the intent that it be interpreted consistently with Coleman's representations.

Finally, Hitchcock declared that CMWS and the property it owned at all times had been treated by the grantors as distinct and separate from that other property which they owned and conveyed to the Chenoweths. The deed of November 26, 1951, pertained only to properties owned by CMWS and those properties were described in that deed. No other properties owned by the grantors were intended to be impressed with a watershed easement for the benefit of CMWS.

Based on this evidence, the ALJ concluded that CMWSI had no easement rights over the Chenoweth parcel. He reasoned that the language of the November 26, 1951, deed was not ambiguous and could not be

---

[6] The remaining eight fifty-firsts interest was subsequently acquired from other heirs and conveyed by deeds recorded in 1952.

interpreted to convey rights in the surrounding lands, and was consistent with the intentions of the parties as expressed in the 1951 agreement.

Thus, the surrounding lands, including the well sites developed by the Chenoweths and leased to CMWSI were not dedicated to public utility water service.

The commission reached a contrary conclusion in its October 12, 1989, decision.[7] That decision, like the proposed decision of the ALJ, concluded that the 1951 conveyances to the Chenoweths were proper since they represented a commonly understood segregation of the Meeker property between public utility and private property for tax and ratemaking purposes.[8] The commission also concluded that the November 26, 1951, deed conveyed the CMWS real estate and all water rights, easements and privileges appurtenant thereto. The November 29, 1951, deed conveyed the remaining Meeker land.

Unlike the ALJ, however, the commission concluded that while the property conveyed by the November 29, 1951, deed was the private real estate of the Chenoweths, it was: "subject to the public utility water rights, easements and privileges granted by the November 26, 1951 deed.

"The rights given to CMWS by the November 26, 1951 deed (and subsequently given to Camp Meeker Water System, Incorporated (CMWSI) by the August 7, 1959 deed)[9] allow the utility to explore for and develop public utility water sources on the Chenoweth land, and to take such actions as may be necessary to ensure that the Chenoweths do not jeopardize the ability of the water system to meet its public utility obligations. The Chenoweths are free, however, to use their land as they see fit so long as that use is consistent with the utility's rights and easements."

The commission reasoned that the Meekers as owners of CMWS did not have a formal easement over the nonoperative portion of their land. Such

---

[7] The findings of the commission commence with the 1951 deed transferring the Meeker properties to CMWSI and the Chenoweths. The evidence regarding events relevant to the properties dates back only to 1932, although the record does reflect that Effie M. Meeker and Julia E. Meeker, her sister, constructed the water system now known as the Camp Meeker Water System, Inc., around 1910 to serve a summer camping and residential community in Sonoma County. Real party in interest, Camp Meeker Recreation and Park District, is both a user of water supplied by CMWSI, and, as a county service district elected by the residents of Camp Meeker, represents their interests in these proceedings.

[8] Accordingly, the commission set aside its earlier ruling that the November 29, 1951, deed was void for want of authorization by the commission for the transfer.

[9] The August 7, 1959, deed to which the commission referred transferred the CMWS properties to CMWSI, and was identical to the November 26, 1951, deed, with the exception of the grantors and grantees.

was not needed because as owners they already possessed the right to explore for and develop new water sources thereon. The public utility thus had a quasi-easement which ripened into a formal easement when the Meekers conveyed the CMWS land to the Chenoweths by the November 26, 1951, deed. The commission also concluded that even if the November 26, 1951, deed had not expressly mentioned easements, an implied easement would have been created by operation of law pursuant to Civil Code section 1104.[10]

In reaching its decision, the commission applied Civil Code sections 806[11] and 1069,[12] as well as case law requiring consideration of the types of rights conveyed, the relationship of the easement to other property owned by the recipient of the easement, the reasonable contemplation of the parties, and an assumption that future needs were to be accommodated. (See *Faus* v. *City of Los Angeles* (1967) 67 Cal.2d 350, 355 [62 Cal.Rptr. 193, 431 P.2d 849]; *Fristoe* v. *Drapeau* (1950) 35 Cal.2d 5, 10 [215 P.2d 729]; *Moylan* v. *Dykes* (1986) 181 Cal.App.3d 561, 569 [226 Cal.Rptr. 673]; and *George* v. *Goshgarian* (1983) 139 Cal.App.3d 856, 861-862 [189 Cal.Rptr. 94].) Based thereon, the commission reasoned that it could interpret any ambiguity in the deed to provide the water company with more, rather than less, property rights. The language of the November 26, 1951, deed, the commission concluded, conveyed to CMWSI "broad rights to water from the land subject to the easements."

These rights were not limited to use of the wells or water sources from which CMWSI drew water in 1951 when the conveyance was made, since those wells and diversions would not permit CMWSI to develop new water sources on the Chenoweth parcel, and many of the sources in use in 1951 had deteriorated or been taken out of service. Therefore, considering the water rights and easements conveyed in the November 26, 1951, deed in light of the relationship of those rights to the public utility land, the commission concluded that they should be interpreted to enable CMWSI to

---

[10] Civil Code section 1104: "A transfer of real property passes all easements attached thereto, and creates in favor thereof an easement to use other real property of the person whose estate is transferred in the same manner and to the same extent as such property was obviously and permanently used by the person whose estate is transferred, for the benefit thereof, at the time when the transfer was agreed upon or completed."

[11] Civil Code section 806: "The extent of a servitude is determined by the terms of the grant, or the nature of the enjoyment by which it was acquired."

[12] Civil Code section 1069: "A grant is to be interpreted in favor of the grantee, except that a reservation in any grant, and every grant by a public officer or body, as such, to a private party, is to be interpreted in favor of the grantor."

continue to meet its obligations as a public utility. That could not have been done if CMWSI were limited to easements in springs in existence in 1951.[13]

The commission also found in a June 13, 1950, commission decision a basis for a reasonable inference that the parties to the 1951 deeds did intend that the Chenoweth parcel be subject to water rights beyond those being utilized at the time of the conveyances, and that those rights were to be expanded to serve an increased customer base. That decision, issued three months prior to the date on which the parties executed the sale agreement, found that CMWS had inadequate water sources to serve existing and future customers, and ordered that numerous improvements in the water supply be made.[14]

Based on this reasoning the commission found:

"[T]he Meeker family operators of CMWS enjoyed quasi-easement rights to use the non-utility portion of their Camp Meeker property for public utility purposes by virtue of their common ownership of the utility and non-utility portions of their property. These rights included the right 1) to take all water flowing over or located under the land; 2) to enter upon the land to explore for, develop, and maintain water sources thereon; 3) to construct dams and reservoirs on the land for water storage and supply purposes; 4) to enter upon the land to maintain such dams and reservoirs; 5) to construct and maintain pipelines and rights of way necessary for the taking of water from the land; 6) to drill wells and develop springs necessary to supply water from the land; 7) to expand their use of the land as necessary to replace deteriorating or obsolete water sources and to develop new sources of water to meet the growing needs of an increased customer base; 8) to

---

[13] The commission found the deeds to be sufficiently ambiguous to warrant consideration of some, but not all, of the extrinsic evidence admitted and considered by the ALJ. It considered the September 1951 agreement between the administratrices and the Chenoweths for the sale of the properties as being relevant to the intent of the parties, but found the deeds themselves to be the best evidence of that intent, and refused to consider an interpretation of the agreement that was inconsistent with the language of the deeds.

The commission considered, but rejected, the declaration of L. G. Hitchcock regarding the parties' understanding of terms in the deeds, reasoning that the November 26, 1951, deed could not have intended to convey only water rights on the CMWS property. The conveyance of the fee necessarily granted those rights to the grantees, and the conveyance of an easement is necessarily conveyance of an interest in the land of another. (Civ. Code, §§ 801, 805.)

[14] The commission cited no evidence that the Chenoweths were aware of this order when they entered into the agreement, or knew of findings in earlier proceedings that further development of spring sources and supplies was necessary to provide adequate service. The only such earlier proceeding to which reference was made by the commission took place in 1932. The commission decision does not further explain the relevance of the findings made in that year or of its conclusion that the Meekers were aware of the necessity that resources on the segregated private real estate holdings of the Meekers be developed.

insist that no one interfere with any of these rights; 9) to rely on the maintenance of the land in a manner that would not adversely affect the utility's water supply operations; and 10) to do anything else necessary to utilize the non-utility portion of their land for public utility water services purposes."

## III

### COMMISSION JURISDICTION

Petitioner assumes that the commission has undertaken to adjudicate incidents of title, and has adjudicated the rights of third parties against the public utility. It argues on that basis that the commission has exceeded its authority and has taken, on behalf of the utility, property owned by the third parties without compensation.

As noted earlier, however, the commission makes no claim to have such jurisdiction. Rather, it purports only to have construed the existing legal rights of CMWSI, and disclaims any power to create new rights. The commission expressly recognizes that its functions do not include determining the validity of contracts, whether claims may be asserted under a contract, or interests in or title to property, those being questions for the courts. (*Hanlon* v. *Eshleman* (1915) 169 Cal. 200 [146 P. 656]. See also *C.B. Lee* (1939) 42 C.R.C. 41.) It claims only the power to construe, for purposes of exercising its regulatory and ratemaking authority, the existing rights of a regulated utility.

In construing the 1951 deeds for that purpose, the commission acted within its constitutional and statutory jurisdiction.

"Private corporations and persons that own, operate, control, or manage a . . . system for the . . . furnishing of . . . water . . . are public utilities subject to control by the Legislature." (Cal. Const., art. XII, § 3.) The commission may, pursuant to the grant of authority found in article XII, section 2 of the California Constitution "[s]ubject to statute and due process . . . establish its own procedures." And, pursuant to article XII, section 5, "[t]he Legislature has plenary power, unlimited by the other provisions of this constitution, but consistent with this article, to confer additional authority and jurisdiction upon the commission . . . ."

In the exercise of its plenary power the Legislature has provided that all charges by a public utility for commodities or services rendered shall be just and reasonable (§ 451) and has given the commission the power and

obligation to determine not only that any rate or increase in a rate is just and reasonable (§§ 454, 728), but also authority to "supervise and regulate every public utility in the State and [to] do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction." (§ 701.)

In regulating a public utility the commission may determine the facilities, service, and method of service in order to ensure that the service provided is adequate (§ 761), and in aid thereof may order that the utility extend or improve its physical facilities or properties. (§ 762.)

■ Further, a public utility may not dispose of any property necessary and useful in the performance of its duties without authorization by the commission. (§ 851.) While this section is most often applied to outright transfers of property, read together with the above sections which authorize the commission to require that a utility ensure its ability to provide adequate service, it unquestionably permits the commission to prevent disposal of such property by indirection, as by failure to exercise or safeguard rights possessed by the utility. (Civ. Code, § 811, subds. 3 & 4. See also, *Crum* v. *Mt. Shasta Power Corp.* (1934) 220 Cal. 295, 309-310 [30 P.2d 30].)

■ Therefore, construction of the November 26, 1951, deed in reference to the transfer of the appurtenant Chenoweth parcel in order to determine CMWSI's rights to sources of water on the Chenoweth parcel was a necessary incident to the commission's consideration of CMWSI's application for an increase in its charges. The commission was obligated to determine if the claimed expense for leasing wells on the Chenoweth parcel was justified, and to ensure that CMWSI did not abandon or otherwise dispose of property in the form of easement rights necessary and useful to meet the present and future needs of its customers.

Similarly, the action taken by the commission in an attempt to ensure that a purchaser of the Chenoweth parcel would not be entitled to assert the conclusive presumption of the second paragraph of section 851 is a reasonable exercise of its power and obligation to ensure that the property of CMWSI is not transferred without its authorization. Since the easement rights of CMWSI over the Chenoweth parcel are not described in the November 29, 1951, deed and thus may not be subject to the constructive notice provision of Civil Code section 1213, the commission could reasonably conclude that an attempt to give actual notice that CMWSI may have such rights is necessary.

## IV

### SUFFICIENCY OF THE EVIDENCE

Petitioner claims that there are neither facts nor law to support the commission's conclusion that CMWSI holds an easement over the Chenoweth parcel. That claim is largely based on evidence other than that on which the commission relied in reaching its decision,[15] however, and fails to acknowledge the limited scope of review permitted this court in commission matters.

### A. *Scope of Review.*

█ Section 1757 limits our consideration of CMWSI's claim that the decision lacks factual support. The question is not whether the evidence is sufficient under traditional criteria for appellate review because section 1757 provides: "No new or additional evidence may be introduced in the Supreme Court, but the cause shall be heard on the record of the commission as certified to by it. *The review shall not be extended further than to determine whether the commission has regularly pursued its authority,* including a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of this State.

"*The findings and conclusions of the commission on questions of fact shall be final and shall not be subject to review except as provided in this article.* Such questions of fact shall include ultimate facts and the findings and conclusions of the commission on reasonableness and discrimination." (Italics added.)

This legislative limitation is expressly authorized by section 5 of article XII of the California Constitution, which vests the Legislature with "plenary power, unlimited by the other provisions of this constitution, but consistent with this article, to . . . establish the manner and scope of review of commission action in a court of record . . . ."

As a result our review of commission decisions "is generally limited to a determination whether the commission has regularly pursued its

---

[15] Petitioner's argument is based in part on the reasoning of the ALJ and evidence he considered. Evidence in any commission hearing is taken by an ALJ (§ 311, subd. (c)), but the commission need not accept any finding made by the ALJ, and "may, in issuing its decision, adopt, modify, or set aside the proposed decision or any part of the decision." (§ 311, subd. (d).)

authority." (*Toward Utility Rate Normalization* v. *Public Utilities Com.* (1988) 44 Cal.3d 870, 880 [245 Cal.Rptr. 8, 750 P.2d 787].) A decision that affects the rights of a party, but has no factual support, would not be one made in the regular pursuit of commission authority and could deny due process. If there is evidence to support the commission's findings, however, the findings are final and unreviewable unless the evidence is undisputed and subject to only one reasonable inference.

"[T]he provision of section 1757, that the findings and conclusions of the commission on questions of fact shall be final, refers to findings and conclusions 'arrived at from the consideration of conflicting evidence and undisputed evidence from which conflicting inferences may reasonably be drawn. Findings and conclusions drawn from undisputed evidence and from which conflicting inferences may not reasonably be drawn, present questions of law.' (*Southern Pac. Co.* v. *Public Utilities Com., supra,* 41 Cal.2d 354, 362.)" (*Pacific Tel. & Tel. Co.* v. *Public Util. Com.* (1965) 62 Cal.2d 634, 647 [44 Cal.Rptr. 1, 401 P.2d 353].)

Therefore, if there is evidence to support the commission's factual findings and conclusions, and those findings and conclusions are the basis for the commission's order or decision, further review by this court is foreclosed. (*Southern Pac. Co.* v. *Public Utilities Com.* (1953) 41 Cal.2d 354, 362 [260 P.2d 70].) We may not substitute our judgment as to the weight to be accorded the evidence or the factual findings of the commission. (*Goldin* v. *Public Utilities Commission* (1979) 23 Cal.3d 638 [153 Cal.Rptr. 802, 592 P.2d 289].)

While section 1760 gives the court the power to exercise its independent judgment on the law and the facts if an order or decision of the commission is challenged on grounds that it violates the federal constitutional rights of the petitioner, no claim to which section 1760 applies is properly before us.

CMWSI does argue that the commission lacks jurisdiction to determine the rights of third parties, a due-process-based claim, or to take private property without compensation, a claim presumably founded in the Fifth and Fourteenth Amendments to the United States Constitution. We have concluded above, however, that the commission has not purported to affect title or create interests in CMWSI and has done nothing more than construe the 1951 deeds for purposes of ratemaking only.

More importantly, however, the decision that CMWSI holds an easement over the Chenoweth parcel is one favorable to CMWSI, which does not claim that the decision violates rights it has as the petitioner. ▮ The

sole question, therefore, is whether there is an evidentiary basis in the record for the commission's conclusion that the November 26, 1951, deed conveyed an easement for water development on the Chenoweth parcel to CMSWI. There is.

B. *Evidence Supporting the Decision.*

1. *The Deed.*

The November 26, 1951, deed expressly conveyed to CMWSI all of the grantor's interest in CMWS and all "easements had, used, and enjoyed in the operation of said System, and also all water and water rights appurtenant to said System and used or useful in its operation."

■ It is axiomatic, as the commission recognized, that an easement conveys rights in or over the land *of another.* "An easement involves primarily the privilege of doing a certain act on, or to the detriment of, another's property. To the creation of an appurtenant easement, two tenements are necessary, a dominant one in favor of which the obligation exists, and a servient one upon which the obligation rests." (*Wright* v. *Best* (1942) 19 Cal.2d 368, 381 [121 P.2d 702]. See also, *Los Angeles etc. Co.* v. *S.P.R.R. Co.* (1902) 136 Cal. 36, 48 [68 P. 308].)

■ The 16-acre parcel and the Chenoweth parcel had, until the November 26, 1951, conveyance, been in the same ownership, notwithstanding the Meekers' separate treatment of the parcels for tax and other recordkeeping purposes. That being so, the deed cannot reasonably be construed as either creating or conveying a then-existing easement burdening the 16-acre parcel. The only theory on which such a conveyance might be premised, revival of an easement existing prior to merger of the dominant and servient estates (see Civ. Code, § 811, subd. 1; *Dixon* v. *Schermeier* (1895) 110 Cal. 582, 585 [42 P. 1091]; 28 Cal.Jur.3d (rev.) Easements, § 52, p. 188), is unsupported by any evidence that such easement existed prior to the acquisition of title to the properties by the Meeker family. The deed therefore created an easement under which the CMWS property became the dominant tenement, holding an easement appurtenant to that land over property in the possession of another.[16]

The language of the November 26, 1951, deed therefore supports the commission finding that the deed conveyed an easement over lands appurtenant to CMWS and its 16-acre parcel.

---

[16] Civil Code section 803: "The land to which an easement is attached is called the dominant tenement; the land upon which a burden or servitude is laid is called the servient tenement."

### 2. *The Burdened Property.*

There is also a basis in the evidence for the findings and conclusion of the commission that the easement conveyed was, by implication, a burden on the Chenoweth parcel. It is not necessary to its validity that the conveyance of an express easement identify the servient tenement. The law implies that a conveyance of real property creates in favor of that property "an easement to use other real property of the person whose estate is transferred in the same manner and to the same extent as such property was obviously and permanently used by the person whose estate is transferred, for the benefit thereof, at the time when the transfer was agreed upon or completed." (Civ. Code, § 1104.) "The extent of a servitude is determined by the terms of the grant, or the nature of the enjoyment by which it was acquired." (Civ. Code, § 806.) It may reasonably be inferred, therefore, that the easement expressly granted in the November 26, 1951, deed burdened the retained property of the grantor, the 600-acre parcel retained by the *Meeker* estate.[17] When the 600-acre parcel was conveyed by the November 29, 1951, deed, it continued to be the servient tenement.

### 3. *The Extent of the Easement.*

Because the November 26, 1951, deed expressly granted an easement over the Chenoweth property, it is not necessary to find an easement by implication, and the easement is not limited by Civil Code section 1104 to uses in existence at the time of the agreement and/or conveyance. The well-established law governing easements by implication is instructive, however, when the deed does not describe the extent of the easement it conveys.

■ In *Fristoe* v. *Drapeau, supra,* 35 Cal.2d 5, 9-10, we accepted the rule as set forth in the Restatement of Property: " 'The extent of an easement created by implication is to be inferred from the circumstances which exist at the time of the conveyance and give rise to the implication. Among these circumstances is the use which is being made of the dominant tenement at that time. Yet it does not follow that the use authorized is to be limited to such use as was required by the dominant tenement at that time. It is to be measured rather by such uses as the parties might reasonably have expected from the future uses of the dominant tenement. What the parties might reasonably have expected is to be ascertained from the circumstances

---

[17] There is no evidence in the record, and no party has suggested, that CMWS or the Meeker family held utility easements over land owned by customers of the utility. (See, e.g., *Pasadena* v. *California-Michigan etc. Co.* (1941) 17 Cal.2d 576 [110 P.2d 983, 133 A.L.R. 1186].) A reasonable inference, therefore, is that the grantors intended to convey an easement over the 600-acre parcel they retained.

existing at the time of the conveyance. It is to be assumed that they anticipated such uses as might reasonably be required by a normal development of the dominant tenement . . . .' (Rest., Property, § 484, comment b.) [¶] Accordingly, in determining the intent of the parties as to the extent of the grantee's rights . . . consideration must be given not only to the actual uses being made at the time of the severance, but also to such uses as the facts and circumstances show were within the reasonable contemplation of the parties at the time of the conveyance."

This rule necessarily applies to express easements when the extent of the easement is in question. ▮ "The effect of section 806 of the Civil Code is to establish intent as the criterion for determining the 'extent of a servitude,' and this is in accord with the rationale of the rules governing easements by implication. (*Fristoe* v. *Drapeau*, 35 Cal.2d 5, 9.)" (*Mosier* v. *Mead* (1955) 45 Cal.2d 629, 633 [290 P.2d 495].) The rule is tempered, of course, by the limitation that if an "easement is founded upon a grant . . . only those interests expressed in the grant and those necessarily incident thereto pass from the owner of the fee. The general rule is clearly established that, despite the granting of an easement, the owner of the servient tenement may make any use of the land that does not interfere unreasonably with the easement." (*Pasadena* v. *California-Michigan etc. Co., supra,* 17 Cal.2d 576, 579.)

▮ There is evidence in the record to support the finding of the commission that the easement granted by the November 26, 1951, deed permits CMWSI to exploit any and all sources of water on the Chenoweth parcel. The deed did not restrict CMWS to use of the wells or springs existing at the time of the conveyance. Rather, the grant included "all water rights appurtenant to said System and used *or useful* in its operation" and "whether expressly described . . . or not." (Italics added.) The commission could reasonably infer from this language and the circumstances in which the conveyance was made that the easement permits CMWSI to use any water sources necessary to replace springs that are no longer adequate and to develop water sources needed to meet the demands created by "normal development of the dominant tenement." (*Fristoe* v. *Drapeau, supra,* 35 Cal.2d 5, 9.)

The commission's construction of the easement is consistent with and supported by the assumption that an express easement is intended to accommodate future needs. (*Faus* v. *City of Los Angeles, supra,* 67 Cal.2d 350, 355.)

### 4. *Relevance of Separate Transfer of Chenoweth Parcel.*

Petitioner claims alternatively that the two deeds in question conclusively establish that the Chenoweth parcel is not useful or necessary.

Petitioner's argument is based on the stipulation in section 851 that: "any disposition of property by a public utility shall be conclusively presumed to be of property which is not useful or necessary in the performance of its duties to the public, as to any purchaser, lessee, or encumbrancer dealing with such property in good faith for value; . . ." Petitioner reasons that the commission's approval of the sale of the 16-acre parcel separately from the Chenoweth parcel established that the latter was not useful or necessary for public benefit.

Our conclusion, that there is an evidentiary basis in the record for the commission's conclusion that the November 26, 1951, deed conveyed to CMWSI an easement for the development and exploitation of such water rights as are needed to adequately service CMWSI's customers, answers that contention.

Inasmuch as the November 26, 1951, conveyance included an easement for water rights in the Chenoweth parcel, the commission cannot be deemed to have determined that this parcel was not useful to CMWS. To the contrary, the manner in which the sale was structured preserved for the utility a "useful" interest in that property, an easement that is "necessary in the performance of [CMWSI's] duties to the public."[18]

The decision is therefore supported by evidence in the record. The inferences drawn from that evidence are reasonable. The findings and conclusions are not subject to further review. The commission did not err in determining the legal significance of its findings in construing the November 26, 1951, deed.

---

[18] Based in part on its assumption that the commission decision was intended to adjudicate the incidents of title to the Chenoweth parcel, rather than construe the deed to the 16-acre parcel now owned by CMWSI, petitioner asserts the commission procedures were irregular because the issue of ownership of Chenoweth parcel was not properly before it and the record owners of that parcel were not given notice. They also seek to support this challenge to the procedure with a claim that the 1951 proceeding in which the commission authorized the sale of the utility was conclusive. Our conclusion that the commission properly construed the November 26, 1951, deed, and purported to do nothing more, makes it unnecessary to address this claim further.

## V

### DISPOSITION

Commission decision No. 89-10-033 is affirmed.

Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Kennard, J., and Arabian, J., concurred.