Filed 7/30/21 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MATT PEAR et al.,<br><br>    Plaintiffs and Respondents,<br><br>    v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>    Defendant and Appellant. | H045045<br>(Santa Clara County<br>Super. Ct. No. CV227801)<br><br>ORDER MODIFYING OPINION<br>TO CORRECT CLERICAL ERROR<br>[NO CHANGE IN JUDGMENT] |

BY THE COURT:

The Court is apprised that, due to clerical error, an incorrect version of the opinion herein was transmitted to the Clerk for filing. It is therefore ordered that the opinion filed on July 28, 2021 be modified as follows:

1. On page 12, replace the citation after the third sentence of the second full paragraph with:

(Merriam-Webster Online Dict. <https://perma.cc/U923-46WT> [as of July 27, 2021].)

2. On page 19, delete the third sentence of the second full paragraph.

3. On page 19, replace the citation after the original sixth sentence of the second full paragraph with:

(Merriam-Webster Online Dict. < https://perma.cc/CZY5-WZTL> [as of July 27, 2021].).

4.  On page 19-20, replace the citation after the original seventh sentence of the second full paragraph with:

(Merriam-Webster Online Dict. < https://perma.cc/98ZZ-SU4L> [as of July 27, 2021].)

5.  On page 21-22, replace the last sentence of the first paragraph of Part II.C.3. with:

The action thus focuses on plaintiffs' *current* uses of the pipeline property; whether some incidental parking differing in size and scope from the current uses may be allowed is beyond the scope of this appeal.

There is no change in the judgment.

Dated: _____          _____

                                 GREENWOOD, P. J.


                                 _____

                                 GROVER, J.


                                 _____

                                 DANNER, J.

**H045045 – *Pear et al. v City and County of San Francisco***

Filed 7/28/21 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MATT PEAR et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, <br><br> Defendant and Appellant. | H045045 <br> (Santa Clara County <br> Super. Ct. No. CV227801) |

Defendant City and County of San Francisco obtained fee title to an 80-foot strip of land by grant deed in 1951 from the grandparents of plaintiffs Matt and Mark Pear to construct an underground pipeline conveying water to San Francisco as part of the Hetch Hetchy Regional Water System. The deed reserved certain rights in plaintiffs' family's favor, including among other things the right to use the surface of the property for pasturage and the right to construct roads and streets "over and across" the property "but not along in the direction of the City's pipe line or lines." The property has served since the 1960s as a paved parking lot for commercial uses on plaintiffs' properties on either side of the pipeline. When a dispute arose about whether parking and related circulation was authorized under the deed versus under a revocable permit issued by defendant in 1967, plaintiffs filed this quiet title action to determine whether their current uses of the pipeline property are authorized under the deed.

A bench trial was conducted after a different panel of this court reversed a summary judgment entered in defendant's favor. The trial court ultimately concluded that the deed authorized plaintiffs to use the pipeline property for ornamental landscaping

as well as automobile access, circulation, and parking. We agree with the trial court that the deed authorizes ornamental landscaping, the three existing paved roads running across the pipeline property, and use of the property to access auto mechanic service bays. However, while recognizing that some degree of parking incidental to those authorized uses may be allowed, we will reverse the judgment because the express language of the deed does not allow plaintiffs' current use of the pipeline property as a parking lot.

## I.    TRIAL COURT PROCEEDINGS

The following summary is based on the statement of decision, supplemented with evidence from the bench trial:

Plaintiffs own three parcels of varying sizes totaling around 12 acres in Mountain View, bordered by Showers Drive to the west, California Street to the north, and Ortega Avenue to the east. The parcels contain a Target retail store, a Wheel Works service center, and a single-family residence. Between the Target parcel to the south and the smaller Wheel Works parcel to the north, defendant owns a strip of land (the pipeline property) approximately 80 feet wide and 863 feet long. About 75 percent of the pipeline property is paved and used for access, circulation, and parking for plaintiffs' adjacent commercial properties. The Wheel Works service bays are perpendicular to the pipeline, so customers' cars must be driven across the pipeline property to be serviced. Two underground pipelines running the length of the pipeline property convey water as part of the Hetch Hetchy Regional Water System.

### A. HISTORY OF THE DEED AND REVOCABLE PERMIT

The San Francisco Board of Supervisors passed a resolution in 1949 authorizing condemnation proceedings to acquire property (including the pipeline property) for a "public use and purpose, to wit: For the construction, maintenance and use of a series of aqueduct pipe lines for the purpose of conveying additional water from its Hetch Hetchy Water Supply System." The resolution states title would be taken in fee simple "subject

2

to such reservations and conditions ... as may be necessary and proper to secure to the present owners ... the privilege of crossing over the same and to construct and maintain over and across [the property] roads, streets, overhead power lines, telephone lines, telegraph lines, [and] also sewers, water pipes, gas pipes and other underground utilities." Those reserved rights were subject to the limitation that the property could not be used in a manner that would "interfere with, damage, or endanger in any way any aqueduct, pipe lines or other structures" built by defendant.

An eminent domain complaint was filed in 1950. Plaintiffs' grandparents (who owned the pipeline property at the time) retained counsel and negotiated the acquisition terms. Defendant sought to minimize severance damages when negotiating the purchase price, given that the pipeline route would cut through plaintiffs' grandparents' property and arguably diminish its value. (See Code Civ. Proc., § 1263.410.) Plaintiffs' grandparents' counsel wrote to defendant objecting to defendant's calculation of the pipeline property's appraised value. The attorney argued the property was "worth $3,500.00 an acre for subdivision purposes, and in the event the owner were to subdivide on his own, it would be possible for him to get substantially more by selling lots." Defendant ultimately paid $5,702 for the pipeline property, which is roughly equal to $3,500 per acre.

Plaintiffs' grandparents conveyed the property to defendant by deed in 1951. (A different panel of this court concluded in an earlier opinion that defendant obtained fee simple title in the transaction.) The deed granted defendant the right to remove any existing fences, install gates as necessary, and "protect pipes and other structures or improvements ... by means of fences or otherwise." However, the deed forbade defendant from constructing "any other fences" on the pipeline property "without the consent" of plaintiffs' grandparents.

The grandparents' conveyance was subject to certain express reservations. The first states plaintiffs' grandparents "are permitted the right to plant, cultivate, irrigate,

3

harvest and retain crops from the [pipeline property], and to use said land for pasturage," until defendant needed the land for construction purposes, and thereafter to use the surface for those purposes on any parts of the pipeline property not actually needed by defendant for construction and maintenance of pipelines and other structures.  The only limitation on agricultural use in the first reservation was that plaintiffs' grandparents "shall not plant any trees" on the pipeline property.

The second reservation states:

"Grantors are permitted the right to construct, maintain, use, repair, replace, and renew, over and across [the pipeline property], (but not along in the direction of the [defendant's] pipe line or lines), fences, roads, streets, earth fills, sewers, water pipes, gas pipes, electric power lines, telephone lines, telegraph lines; provided, however, that the locations and grades of such improvements and structures of the Grantors, and the amount of any earth fill, proposed to be placed on [the pipeline property] by the Grantors, shall first be approved by [defendant's] Public Utilities Commission; provided further, that the Grantors shall not use [the pipeline property], or permit the same to be used, for any purpose or in any manner which will interfere with, damage, or endanger in any way any aqueduct pipe lines and other structures and improvements, appurtenances or appliances of the [defendant].  The Grantors shall install gates in any additional fences which [they] may construct across [the pipeline property] sufficient in width to allow passage of trucks and other equipment."

The two reservations expressly "inure to the benefit of, and bind, the heirs, successors and assigns of the respective parties hereto."

Plaintiffs' grandparents continued to use the land on either side of the pipeline property as an orchard and ran a year-round farm stand selling produce until the mid-1960s.  The surface of the pipeline property was used for associated automobile access and parking during that period.  But there is no evidence that defendant approved or was even aware of how the surface of the pipeline property was being used at that time.

Plaintiffs' family leased the parcel now occupied by Target for a planned retail store in 1966.  Defendant was notified of the proposed development by the City of Mountain View and communicated with plaintiffs' family about the parties' rights in the

4

pipeline property. The parties disagreed about how to interpret their respective rights under the deed. To allow the development to proceed, plaintiffs' family accepted under protest a revocable permit from defendant in 1967, which allowed use of the pipeline property for " 'additional parking and landscaping' " in exchange for payment of $50 per month, indemnification, and insurance. (The parties stipulated at trial that the permit was admissible for the limited purpose of showing that the foregoing quoted language was part of it. Plaintiffs argued the remainder of the permit was inadmissible as a settlement agreement (Code Civ. Proc., § 1152).)

In 2012, defendant sought to renegotiate the monthly payment under the revocable permit. Defendant sent an employee from its Public Utilities Commission to inspect the pipeline property and prepare an estimate of the market value of plaintiffs' uses of the property. The employee estimated the market value of the existing access, circulation, and parking uses of the pipeline property as between $4,500 and $6,200 per month. Defendant informed plaintiffs it sought to increase the rent amount in the revocable permit to reflect defendant's estimate of market value. Plaintiffs sued to quiet title after negotiations were unsuccessful.

## B. QUIET TITLE LITIGATION

Plaintiffs' complaint contained four causes of action seeking: (1) to quiet title under the deed to allow plaintiffs to use the pipeline property for its current uses; (2) an irrevocable license to use the pipeline property for its current uses; (3) a declaration of plaintiffs' right to use the pipeline property for its current uses; and (4) injunctive relief prohibiting defendant from fencing off the pipeline property or otherwise limiting plaintiffs' current uses. As to the quiet title cause of action, plaintiffs pray for: "Judgment quieting title in Plaintiffs to the Easement or other appropriate retained rights, and a determination that the use[s] to which the surface of the [pipeline property] is currently put, namely, for access, parking and circulation, is within the scope of, and permitted under, said Easement or other retained rights." Defendant successfully moved

for summary judgment as to all causes of action, and plaintiffs appealed. The previous appeal reversed the judgment in 2016, finding triable issues of fact in the quiet title cause of action regarding whether some or all of plaintiffs' current uses were authorized under the deed.

The case proceeded to a court trial on remand, where evidence consistent with the foregoing factual summary was presented. The trial court issued a detailed statement of decision, which addressed three separate categories of surface use: ornamental landscaping, roads and streets, and a catch-all category for other uses (paving, parking, and access to the Wheel Works service bays). The trial court concluded that the ornamental landscaping was encompassed within the Deed's reserved right to " 'plant, cultivate, irrigate, harvest and retain' crops and pasturage" on the pipeline property. The statement of decision noted that during "closing arguments, [defendant's] counsel agreed that growing grass on the Pipeline Property is permitted" because grass was akin to pasturage. As to vegetation, the court concluded: "Crops, pasture, grass and ornamental vegetation are permitted. Trees are not."

Regarding roads and streets, the trial court noted they are permitted by the Deed's second reservation "as long as they go 'over and across' the Pipeline Property and not 'in the direction of the City's pipe line or lines.' " The court also noted that the deed imposed "no limit on the number of roads and streets or their width or location," and stated the "only limitation is the direction." The court interpreted the word "across" as used in the deed to mean going " 'from one side to the opposite side of,' " and also decided that roads or streets did not have to be precisely perpendicular to be allowed under the deed. From an aerial photograph of the properties, the court identified three paved areas over and across the pipeline property that the court determined to be roads: "the entry road from California Street closest to Ortega Avenue"; another "entry from California Street – to the west of the first entry – [that] can connect to the road in front of the Target store"; and the "access road close to, and parallel to, Showers Drive." The

6

court decided all three of those roads were permissible under the deed, even though the road connecting to the front of the Target store is not strictly perpendicular to the pipeline property.

The trial court then addressed plaintiffs' remaining uses on the pipeline property, describing them as: "the parking area between the two entries from California Street, the line of parking stalls on the Pipeline Property that can be entered from the Target parking lot that is to the south, and the pavement and line of parking stalls between Wheel Works and Target's main parking lot." The court reasoned that applying the plain meaning of the deed did not resolve whether those uses were authorized. The court turned to extrinsic evidence (including expert appraiser testimony) of a mutual understanding in 1951 that plaintiffs' property could become a residential development. If subdivided, the court estimated that up to 40 percent of the pipeline property could have been paved by driveways traveling over and across it. The court found that residential development "would be consistent with the parties' desire to minimize severance damages." The court also found (based on expert testimony) that commercial development of plaintiffs' properties was within the reasonable contemplation of the parties in 1951. As to the existing uses of the property, the court noted defendant had submitted no evidence that plaintiffs' activities interfere with defendant's uses. The court also pointed to defendant's proposed statement of decision, which acknowledged that three roads along with temporary incidental parking would be consistent with plaintiffs' rights under the deed. Based on the foregoing, the trial court concluded that the "paving on the Pipeline Property is permitted" and that all of plaintiffs' access, circulation, and parking uses are allowed under the deed.

The judgment restates plaintiffs' property rights. Regarding the first reservation, "crops, pasture, grass and ornamental vegetation are permitted. Trees are not. The landscaping shall not affect construction, maintenance, repair, operation renewal and replacement of Defendant's aqueduct pipe lines and other structures and improvements,

7

appurtenances and appliances." Regarding the second reservation, plaintiffs' "current use of the Pipeline Property as a paved and landscaped area used for access, circulation, and temporary parking serving the Pear Property (the "Permitted Uses") is permitted under the [second reservation] and may continue." Plaintiffs agreed to "(1) maintain in force commercially reasonable insurance for personal injury and property damage resulting from the Permitted Uses; and/or (2) indemnify and hold harmless Defendant from liability for personal injury or property damage resulting from the Permitted Uses." Defendant was permanently enjoined from erecting fences on the pipeline property without plaintiffs' consent, and the trial court ordered plaintiffs to remove a large shed from part of the pipeline property; those injunctive elements of the judgment are not at issue on appeal.

## II.    DISCUSSION

### A. DEED INTERPRETATION PRINCIPLES

Deeds are interpreted in the same manner as contracts. (*Butler v. City of Palos Verdes Estates* (2005) 135 Cal.App.4th 174, 181.) "The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." (Civ. Code, § 1644.) In interpreting a deed, our primary objective is to determine and carry out the intent of the parties by looking at the deed's plain language, "as construed in light of any extrinsic evidence which may prove a meaning [of] which the language of the instrument is reasonably susceptible." (*City and County of San Francisco v. Union Pacific R.R. Co.* (1996) 50 Cal.App.4th 987, 994.) Courts may look to dictionary definitions to assist in determining the ordinary and popular sense of a term. (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1122.) But courts must avoid interpretations that would render terms of an instrument mere surplusage. (*Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 503 (*Boghos*).) We exercise our independent

8

judgment to interpret the language of a deed, and we review for substantial evidence the trial court's resolution of any conflicting extrinsic evidence. (*MTC Financial Inc. v. California Dept. of Tax & Fee Administration* (2019) 41 Cal.App.5th 742, 746 (*MTC*).)

The parties agree that the rights *reserved* by plaintiffs in the deed operate as easements on the pipeline property. Easements are a type of servitude; the "extent of a servitude is determined by the terms of the grant, or the nature of the enjoyment by which it was acquired." (Civ. Code, § 806.) For express easements like those contained in the deed reservations, " 'only those interests expressed in the grant and those necessarily incident thereto pass from the owner of the fee.' " (*Camp Meeker Water System, Inc. v. Public Utilities Com.* (1990) 51 Cal.3d 845, 867 (*Camp Meeker*), superseded by statute on another ground, as stated in *Pacific Bell v. Public Utilities Com.* (2000) 79 Cal.App.4th 269, 281.) But if the scope or extent of an express easement is unclear, its use " ' "is to be measured rather by such uses as the parties might reasonably have expected from the future uses of the dominant tenement." ' " (*Camp Meeker*, at pp. 866–867.) That scope includes " 'such uses as the facts and circumstances show were within the reasonable contemplation of the parties at the time of the conveyance.' " (*Id.* at p. 867.)

Both the dominant and servient tenements to an easement " 'have the right to insist that so long as the easement is enjoyed it shall remain substantially the same as it was at the time the right accrued, entirely regardless of the question as to the relative benefit and damage that would ensue to the parties by reason of a change in the mode and manner of its enjoyment.' " (*Whalen v. Ruiz* (1953) 40 Cal.2d 294, 302.) But even where the primary objective of an express easement does not change, the dominant tenement's use of the easement may be updated. (See *Faus v. City of Los Angeles* (1967) 67 Cal.2d 350, 358 (*Faus*) [changing use of easement right-of-way from authorized electric railroad service to use as bus route did not invalidate easement].) " '[T]he owner of a dominant tenement must use his easement and rights in such a way as to impose as slight a burden

9

as possible on the servient tenement.' " (*Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 356, fn. 17.)

Defendant argues the trial court erred by applying Civil Code section 1069 in plaintiffs' favor. That section provides: "A grant is to be interpreted in favor of the grantee, except that a reservation in any grant, and every grant by a public officer or body, as such, to a private party, is to be interpreted in favor of the grantor." The trial court found that because the rights at issue derive from the deed from plaintiffs' grandparents, the reservations should be interpreted in plaintiffs' favor. We review this question of statutory interpretation de novo. (*Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724.)

We find no error in the trial court's application of Civil Code section 1069. Plaintiffs' grandparents were the grantors in the deed that transferred fee title in the pipeline property to defendant and reserved the easements that are at issue here. Indeed, plaintiffs' grandparents are referred to as "Grantors" throughout the Deed. Defendant argues that *it* was the grantor because it granted *back* the reservations. Defendant's argument conflates the meaning of "grant" and "reservation" in Civil Code section 1069, which is contrary to settled statutory interpretation principles. (*Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334, 342 [" '[w]hen the Legislature uses materially different language in statutory provisions addressing the same subject or related subjects, the normal inference is that the Legislature intended a difference in meaning.' "].)

The argument is also based on authorities arising outside the context of Civil Code section 1069. (See *City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 244 [discussing reservation of an easement as showing intent to convey fee title, the Supreme Court noted that when " 'an interest is "reserved," the entire fee title is transferred to the grantee and the grantee grants back a new interest to the grantor' "].) Defendant relies on *Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333 (*Red Mountain*) (which involved several property transactions, only

10

one of which is relevant to our discussion).  The Fallbrook Public Utilities District (Fallbrook) purchased land near one of its reservoirs from a private landowner.  (*Id.* at p. 339.)  The parties signed escrow instructions that set forth the details of the land purchase, including the following: " '[Fallbrook] [a]grees to grant at any future time ... a 60 foot easement over [an] existing road' " to the private landowners or their successors in interest.  (*Id.* at pp. 339–340.)  Red Mountain (a successor in interest to the original landowner) sued Fallbrook for breach of contract when Fallbrook refused to grant the access easement.  On appeal after a jury verdict in Red Mountain's favor, Fallbrook argued the trial court erred by not applying Civil Code section 1069 and construing the agreement in Fallbrook's favor as a public entity.  (*Red Mountain*, at p. 344.)  The appellate court agreed, finding that "[a]lthough the ambiguity is in *an agreement* by a public entity to grant an easement, and not in an actual grant, we conclude that it is appropriate to apply [Civil Code] section 1069 in construing the agreement because the ambiguity concerns the nature and scope of the easement to be granted." (*Red Mountain*, at p. 345.)

Red Mountain did not argue that as Fallbrook's agreement to grant an easement was effectively a reservation in a grant by the private landowner, it should have been construed in favor of the private grantor under Civil Code section 1069.  *Red Mountain* is also distinguishable from the facts here.  At issue in that case was an agreement to grant an easement at some future time, whereas here plaintiffs' grandparents expressly reserved their rights with immediate effect under a deed.  Significantly, the *Red Mountain* court did not grapple with the issue presented here—whether a reservation in a deed from a private grantor to a public entity grantee is to be interpreted in favor of the private grantor.  (*Mercury Ins. Group v. Superior Court* (1998) 19 Cal.4th 332, 348 ["A decision, of course, is not authority for what it does not consider."].)

In concluding that Civil Code section 1069 mandates that the reservations be construed in plaintiffs' favor, we are mindful that the " 'rule must be considered in

11

connection with other provisions of the Code in reference to interpretations, the most prominent of which is that all interpretations should be directed toward the ascertainment of the true intent of the parties.' " (*Main v. Legnitto* (1964) 230 Cal.App.2d 667, 678.)

## B.  FIRST RESERVATION:  CULTIVATION AND PASTURAGE

Defendant argues the trial court erred by finding that the first reservation allows plaintiffs to plant grass and ornamental vegetation on the pipeline property.  Defendant contends the "right to plant grass and ornamental landscaping is neither expressly conveyed in the [deed], nor necessary and incidental to the permitted agricultural uses." The first reservation allows plaintiffs to "plant, cultivate, irrigate, harvest and retain crops from the [pipeline property], and to use said land for pasturage," until defendant uses the land for pipeline construction, and thereafter to use the surface for those cultivation and pasturage purposes on any parts of the pipeline property not actually needed by defendant for construction and maintenance of pipelines and other structures.  The reservation is clear that plaintiffs "shall not plant any trees" on the pipeline property.

Separating the uses to which defendant objects, we focus first on whether plaintiffs can plant grass.  Contrary to defendant's position on appeal, defendant's trial counsel stated during closing argument that "to the extent the [plaintiffs] want to use it for planting of grass consistent with what would be planted for pasturage, I think that would be consistent with [the first reservation]."  That concession fits with the ordinary sense of "pasturage" as "plants (such as grass) grown for the feeding especially of grazing animals."  (Merriam-Webster Online Dict. <https://www.merriam-webster.com/dictionary/pasture> [as of May 15, 2020].)  We conclude grass is reasonably contained within the plain language of the first reservation.

Ornamental landscaping is farther removed from the language of the first reservation.  We nonetheless conclude it is authorized according to the reasoning of *Faus* and other authorities which allow modernization with substantially similar uses where the primary objective and purpose of the easement does not change.  (*Faus*, *supra*,

12

67 Cal.2d at p. 358.) Indeed, two individuals who had worked for defendant managing its rights-of-way testified that landscaping by parties with agricultural reservations was considered permissible by defendant. Though not technically relevant to the parties' intent at the time the deed was executed, the former employees' testimony suggests that ornamental landscaping is consistent with the primary objective and purpose of the first reservation. We note, however, that ornamental landscaping does not include the planting of any trees on the pipeline property, which is expressly excluded from the first reservation.

## C. SECOND RESERVATION: ROADS, STREETS, AND OTHER IMPROVEMENTS

Defendant argues the trial court erred by determining that all of plaintiffs' current paving, access, and parking uses on the pipeline property are authorized by the deed's second reservation. The second reservation states that plaintiffs are "permitted the right to construct, maintain, use, repair, replace, and renew, over and across [the pipeline property], (but not along in the direction of [defendant's] pipe line or lines), fences, roads, streets, earth fills, sewers, water pipes, gas pipes, electric power lines, telephone lines, [and] telegraph lines." In addition to the directional limitation, the reservation contains two other limitations on plaintiffs' use of the pipeline property: (1) plaintiffs must obtain approval for any improvements from defendant's Public Utilities Commission; and (2) plaintiffs must not use the pipeline property "in any manner which will interfere with, damage, or endanger in any way any aqueduct pipe lines and other structures and improvements, appurtenances or appliances of [defendant]."

The second reservation does not merely allow the dominant tenement to use the servient tenement for a single access route; it expansively allows plaintiffs to maintain multiple "roads" and "streets" over and across the pipeline property. As such, more traditional right-of-way cases defendant relies on such as *Youngstown Steel Products Co. of Cal. v. City of Los Angeles* (1952) 38 Cal.2d 407 are not conclusive. But as defendant points out, the second reservation ultimately remains only an easement rather than fee

13

title.  As the servient tenement owner, defendant "may use [the] property in any manner not inconsistent with the easement so long as it does not unreasonably impede the dominant tenant[s] in [their] rights."  (*City of Los Angeles v. Howard* (1966) 244 Cal.App.2d 538, 543 (*Howard*) [fee owner of property over which municipality had a right-of-way easement for overhead powerlines was permitted to use the surface of the easement area so long as it did not interfere with municipality's easement].)

Before reviewing whether plaintiffs' specific uses are authorized by the second reservation, we note that the trial court rejected as "unhelpful" all evidence related to plaintiffs' use of the property in the 1950s and 1960s because "there is no credible evidence that Defendant reviewed and evaluated whether or not the use of the Pipeline Property by the [plaintiffs'] family was consistent or inconsistent with the parties' respective rights under the Deed."  As plaintiffs present nothing to suggest the trial court's conclusion on that point was unsupported by substantial evidence, we likewise do not consider any evidence related to plaintiffs' use of the property during that period.

### 1. The Three Identified Roads are Authorized by the Deed

The second reservation unambiguously permits plaintiffs to build roads and streets over and across the pipeline property.  Defendant concedes as much in its reply:  "The language of the Deed confers the right to build and use roads and streets, but not a parking lot."  The trial court found that three such roads already exist on the pipeline property:  two connecting to the public street to the north of plaintiffs' properties (California St.), and one connecting to the road to the west of plaintiffs' properties (Showers Dr.).  Defendant does not challenge those findings specifically, instead arguing more generally that the second reservation does "not authorize [plaintiffs] to pave [defendant's] Property for use as a parking lot in support of the commercial shopping center on their adjacent parcels."

Though the second reservation unambiguously allows plaintiffs to construct "roads" and "streets" over and across the pipeline property, it does not specify whether

14

they are limited to private use by plaintiffs or may include broader commercial use. " 'A grant in general terms of an easement of way will ordinarily be construed as creating a general right of way capable of use in connection with the dominant tenement for all reasonable purposes.' " (*Laux v. Freed* (1960) 53 Cal.2d 512, 525.) And as we have already discussed, if the scope or extent of an express easement is unclear, its use " ' "is to be measured rather by such uses as the parties might reasonably have expected from the future uses of the dominant tenement." ' " (*Camp Meeker*, *supra*, 51 Cal.3d at pp. 866–867.) The trial court found that "[b]oth sides understood the Properties might be used for a residential development" and that, based on expert testimony, it was also within the reasonable contemplation of the parties that plaintiffs' properties "might be used for commercial development." Because the trial court resolved a factual issue regarding the parties' mutual intent, we review its findings for substantial evidence. (*MTC*, *supra*, 41 Cal.App.5th at p. 746.)

Regarding residential development, defendant argues that "no witness claimed and no evidence indicated that in 1951, either [plaintiffs] or [defendant] actually intended or expected the [plaintiffs'] parcels to be subdivided for residential use." But in 1951 plaintiffs' grandparents' attorney estimated the compensation due for the pipeline property based on its worth for residential "subdivision purposes" and defendant ultimately paid them consistent with that valuation. Substantial evidence shows both parties considered the property's value for potential residential development. It supports the trial court's finding that residential development of plaintiffs' properties could be reasonably expected and that plaintiffs would use the roads and streets authorized under the second reservation to serve those purposes. Defendant points to other evidence in the record suggesting that some members of plaintiffs' family were opposed to residential development, but we will not reverse a finding supported by substantial evidence merely because other evidence would have supported a different decision. (*Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1747 ["All factual matters must be

15

viewed in favor of the prevailing party and in support of the judgment. All conflicts in the evidence must be resolved in favor of the judgment."].)

Regarding commercial development, plaintiffs offered testimony by commercial real estate appraiser Chris Carneghi, an expert in severance damages and related issues. He opined based on his research that the highest and best use of plaintiffs' property in 1951 was for "urban development." He also noted that nearby property was being developed during that period as a commercial shopping center. Defendant's expert appraiser opined that the highest and best use of the property in 1951 was for residential development, but he acknowledged on cross-examination that one of the comparable properties he used when valuing the pipeline property was a nearby commercial property that sold in 1949. The foregoing provides substantial evidence to support the trial court's finding that commercial development was within the reasonable contemplation of the parties in 1951 and that commercial use of the roads built over and across the pipeline property was therefore authorized by the second reservation.

The trial court acknowledged that one of the three roads was not perfectly perpendicular to the direction of the pipelines. The court nonetheless concluded the road was authorized by the second reservation because it traveled between plaintiffs' properties " 'across' the Pipeline Property and would not be 'in the direction of [defendant's] pipe line or lines.' " We find the trial court's interpretation to be reasonable, given that the deed does not specify that roads be exactly perpendicular.

We acknowledge that the second reservation requires plaintiffs to obtain defendant's approval of the location and grade of improvements before construction. However, given that the three roads are authorized by the second reservation and that defendant agrees it cannot unreasonably withhold consent, the trial court correctly concluded that the three existing roads may remain on the pipeline property despite not having been approved by defendant. Any additional roads over and across the pipeline

16

property must comply with all terms of the second reservation, including obtaining defendant's prior approval.

### 2. The Striped Parking Area is Not Authorized by the Deed

We next turn to whether plaintiffs' other uses of the pipeline property (namely, as a parking lot and as an access route to the Wheel Works service bays) are authorized by the deed. The trial court broadly concluded that "the paving on the Pipeline Property is permitted." But whether paving is allowed does not address the specific questions before the trial court: whether plaintiffs' actual uses of the pipeline property are authorized under the second reservation. The second reservation allows plaintiffs "to construct, maintain, use, repair, replace, and renew, over and across [the pipeline property], (but not along in the direction of the [defendant's] pipe line or lines), fences, roads, streets, earth fills, sewers, water pipes, gas pipes, electric power lines, telephone lines, [and] telegraph lines." Plaintiffs can therefore use the property for those express purposes, as well as " 'those necessarily incident thereto.' " (*Camp Meeker*, *supra*, 51 Cal.3d at p. 867.)

First we address plaintiffs' use of the pipeline property to access the Wheel Works service bays. The undisputed evidence shows that the service bays are perpendicular to the pipeline property, such that cars must cross the pipeline property to be serviced. On this record, we conclude the Wheel Works use is authorized by the second reservation because cars travel on what is effectively a roadway "over and across" the pipeline property.

We separately address plaintiffs' predominant use of the pipeline property as a striped parking lot, covering most of the 75 percent of the pipeline property that is paved. Parking is allowed on the pipeline property only to the extent it is incident to the uses which are authorized in the second reservation, because parking is not among the expressly authorized uses. The trial court appears to have concluded that the parking lot use is authorized as a secondary right to plaintiffs' express right to have roads and streets on the pipeline property. But a "secondary easement which accompanies a principal

17

easement is no more than the right to do such things as are necessary to the enjoyment of the principal easement (for instance, to make repairs, renewals and replacements)." (*Howard*, *supra*, 244 Cal.App.2d at p. 543; *Dolnikov v. Ekizian* (2013) 222 Cal.App.4th 419, 429 [concluding grading and a retaining wall qualified as secondary rights because they were necessary incidents to an easement for ingress and egress: "A secondary easement may be exercised 'only when necessary and in such reasonable manner as not to increase the burden needlessly on the servient estate or to enlarge it by alteration in the mode of operation.' ".) A parking lot is not necessary to the enjoyment of a road, nor does it represent merely the "occasional or temporary parking that normally accompanies the movement of vehicles in and out of, or over, a location." (See *Keeler v. Haky* (1958) 160 Cal.App.2d 471, 474, 476 (*Keeler*) [finding 20-by-140-foot easement for a private road "to pass and repass along, over and upon" did not authorize dominant tenement to use the easement "surfaced with concrete and marked off by painted white lines for parking stalls, as a permanent parking lot for 10 or 11 cars owned by tenants" of an adjoining apartment building].) Similarly, the case plaintiffs cite deeming a vista point parking area a secondary right to a road easement is readily distinguishable because the easement in that case was for a "highway," not merely a road or street. (*Norris v. State ex rel. Dept. of Public Works* (1968) 261 Cal.App.2d 41, 48.)

We note that some incidental parking may be allowed as ancillary to authorized roads and streets. Defendant acknowledges as much in its briefing. Even if some ancillary parking is allowed as a secondary right, any such parking would nonetheless be subject to the second reservation's express directional limitation. As currently situated, the striped parking area violates that directional limitation; it covers such a large percentage of the pipeline property that it exists not only "over and across" but *also* necessarily "along in the direction of" the pipeline. Exercising our independent judgment, we conclude that the current parking use exceeds the scope of parking that may be authorized as a secondary right to the uses expressly authorized in the second

18

reservation. The trial court was incorrect to find that the parking lot is authorized as a secondary right to the primary rights conferred by that reservation.

The remainder of the trial court's statement of decision does not save the judgment. Plaintiffs argue the parenthetical modifying phrase "not along in the direction of" was intended to limit the direction of only *subsurface* improvements. Plaintiffs' expert made the same assertion during his testimony, stating "in a perfect world, that parenthesis would be moved forward three words until we got to earth works or [sewers or] the like." We see no evidence in the record to support a mutual intent by the parties that the directional limitation apply solely to subsurface improvements. The trial court also rejected that interpretation by adopting definitions of "across" that included " 'from one side to the opposite side of,' " and by applying the directional limitation when discussing roads under the same reservation.

Under Civil Code section 1644, "[t]he words of a contract are to be understood in their ordinary and popular sense." Plaintiffs proffer dictionary definitions of "over" and "across," contending the "dictionary defines 'over' to mean 'so as to cover the whole surface'; 'across' means 'so as to reach or spread over or throughout.' " "The words of a contract are to be understood in their ordinary and popular sense." (Civ. Code, § 1644.) We disagree with plaintiffs' claim that the foregoing definitions represent the ordinary and popular definitions of "over" and "across," or the "the most reasonable construction" of the deed. Though plaintiffs' definitions do appear in the Merriam-Webster Online Dictionary they cite, they are not the primary definitions offered for those words. The first entry for "over" in that dictionary is: "across a barrier or intervening (see INTERVENE sense 4) space *especially* : across the goal line in football // threw the ball *over*"; whereas plaintiffs' proffered definition is the third listed entry. (Merriam-Webster Online Dict. <https://www.merriam-webster.com/dictionary/over> [as of May 15, 2021].) The first entry for "across" in the same dictionary is "from one side to the opposite side of : over, through // swam *across* the river." (Merriam-Webster Online Dict.

19

<https://www.merriam-webster.com/dictionary/across> [as of May 15, 2021].)  Plaintiffs' proffered definition of "across" is not even contained in the main entry for the word, but rather appears as an "English Language Learners" definition.  (*Ibid.*)  We agree with the trial court that the primary definitions appearing in plaintiffs' chosen dictionary are the ordinary and popular senses of the words "over" and "across."  The very inclusion of an express directional limitation in the deed buttresses that conclusion.  If we were to adopt plaintiffs' definitions and interpret the second reservation to allow improvements covering the entire surface of the pipeline, it would render the directional limitation mere surplusage.  (*Boghos*, *supra*, 36 Cal.4th at p. 503.)

Plaintiffs and the trial court repeatedly refer to defendant's desire to minimize severance damages as a motivation to agree to the second reservation.  Plaintiffs also argue the trial court's findings are consistent with proper application of the rule of construction found in Civil Code section 1069.  But those principles cannot be used to rewrite the plain language of the second reservation.  The deed was the product of an arm's-length negotiation between defendant and plaintiffs' grandparents (who were represented by counsel), and its terms must be interpreted like any other contract.

The trial court noted it was originally contemplated that plaintiffs' properties might be subdivided for residential development.  According to the trial court's calculations, such development could have resulted in up to 40 percent of the pipeline property being paved by driveways over and across it.  Even assuming the accuracy of the estimated driveway surface area potential, the figure does not translate to the existing non-driveway uses.  One reason is textual:  While driveways may be authorized as incidental to the roads or streets expressly referenced in the second reservation, the same cannot be said of a parking lot.  Another reason is based on scale:  In contrast to the 40 percent coverage for driveways calculated by the trial court, it is undisputed that 75 percent of the pipeline property has been paved by plaintiffs.  Based on the record developed at trial, we conclude that plaintiffs' existing parking use also overburdens

20

defendant's rights under the second reservation. (See *Red Mountain*, *supra*, 143 Cal.App.4th at p. 350 ["The owner of an easement cannot materially increase the burden of the easement on the servient estate or impose a new burden."].)

The trial court found eventual commercial development to have been within the reasonable contemplation of the parties. As we have discussed, substantial evidence supports that finding, such that commercial use of roads explicitly authorized by the second reservation is permissible. But here again, original contemplation of future commercial uses does not mean that plaintiffs can utilize the pipeline property in ways that are specifically excluded in the second reservation.

The trial court found defendant offered "no evidence that Plaintiffs' activities interfere[] with Defendant's current activities." (Italics omitted.) That finding appears to correspond to the prohibition in the second reservation on plaintiffs using the pipeline property "in any manner which will interfere with, damage, or endanger in any way any aqueduct pipe lines." But because that limitation applies to *any* use of the pipeline property by plaintiffs, the finding is legally irrelevant to determining the scope of plaintiffs' *rights* under the second reservation—i.e., " 'only those interests expressed in the grant and those necessarily incident thereto.' " (*Camp Meeker*, *supra*, 51 Cal.3d at p. 867.)

### 3. The Extent to Which Incidental Parking is Authorized is Beyond the Scope of this Action

The final issue discussed by the parties is whether some incidental parking is allowed as a secondary right to plaintiffs' express right to have roads and streets "over and across" the pipeline property. (See *Keeler*, *supra*, 160 Cal.App.2d at p. 476.) Plaintiffs' quiet title action sought a determination that the "use[s] to which the surface of the [pipeline property] is currently put, namely, for access, parking and circulation, is within the scope of, and permitted under" the deed. The action thus focuses on plaintiffs'

21

*current* uses of the pipeline property; whether some incidental parking differing in size and scope from the current uses is beyond the scope of this appeal.

We express no opinion on the incidental parking issue, other than to note that all future uses of the pipeline property must comply with the deed's express language (including the second reservation's directional limitation). Nothing in our decision is intended to prevent the parties from resolving the question of parking by negotiation, administrative permit or other process.

## III.    DISPOSITION

The judgment is reversed and the matter remanded with directions to enter a new judgment quieting title regarding plaintiffs' current uses consistent with this opinion. Grass and ornamental landscaping, the three existing roads, and access to the Wheel Works service bays are authorized uses under the deed. The existing parking lot use is not authorized under the deed. The judgment must also note plaintiffs' agreement to maintain insurance and to indemnify defendant for all authorized uses of the pipeline property, and defendant's agreement not to fence off the pipeline property. Each party shall bear its own costs on appeal.

_____

Grover, J.

**WE CONCUR:**


_____

Greenwood, P. J.


_____

Danner, J.


**H045045 -** *Pear et al. v. City and County of San Francisco*

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court Case No. CV227801 |
| Trial Judge: | Hon. Thomas E. Kuhnle |
| Counsel for Plaintiffs and<br>Respondents MATT PEAR et al: | Basil S. Shiber<br>Jana L. Contreras<br>  Miller Starr Regalia |
| Counsel for Defendant and Appellant<br>CITY AND COUNTY OF SAN<br>FRANCISCO: | Dennis J. Herrera<br>  City Attorney<br>James M. Emery<br>Brian F. Crossman<br>  Deputy City Attorneys |